The **UNITED STATES JUNIOR CHAMBER OF COMMERCE**

v.

The **UNITED STATES.**

No. 125–62.

United States Court of Claims.
July 17, 1964.

---

Carl D. Hall, Jr., Tulsa, Okl., for plaintiff.

Joseph P. Spellman, Washington, D. C., with whom was Asst. Atty. Gen. Louis F. Oberdorfer, for defendant; Edward S. Smith, Lyle M. Turner, and Theodore D. Peyser, Jr., Washington, D. C., were on the brief.

Before JONES, Senior Judge, and WHITAKER, LARAMORE, DURFEE and DAVIS, Judges.

JONES, Senior Judge.

This is a suit by The United States Junior Chamber of Commerce to recover $747.89 as alleged erroneously assessed withholding and F.I.C.A. taxes,[1] together with interest thereon, for the years 1959 and 1960. The principal issue for our determination is the applicability, under the facts of this case, of the exclusionary rule contained in § 119 of the Internal Revenue Code of 1954.

Plaintiff is a nonprofit corporation, incorporated under the laws of the State of Missouri. It was organized for "such educational and charitable purposes as will promote and foster the growth and development of young men's civic organizations in the United States." Among its activities are such programs as the promotion of interest in youth athletic programs, safe driving programs, and community and school development programs. The headquarters and principal offices of plaintiff are located in Tulsa, Oklahoma. Plaintiff owns and maintains a residential building in Tulsa, known as the "U.S. Jaycee White House" (hereinafter referred to as the House), which is the official residence and home of the

1. F.I.C.A. are the initials of the Federal Insurance Contributions Act, the tax under which is commonly known as the social security tax.

president of plaintiff during his term of office.

The president of plaintiff is its chief executive officer and is elected at the annual meeting by a majority vote of plaintiff's membership. He is elected for a term of one year only, and may not succeed himself in office. During the years involved in this suit, plaintiff had three presidents who, prior to their election, lived and worked in North Carolina, Iowa, and Pennsylvania, respectively. At the expiration of their terms of office, each president returned to his respective residence and employment.

The by-laws of plaintiff provide, in pertinent part, that:

"Because of the benefits and convenience accruing to the Corporation by having the President and his family, if any, reside in Tulsa in the home built by the Corporation for the President, the President and his family shall reside at the U.S. Jaycee White House in Tulsa, during his tenure of office."

In accordance with the by-laws, each of the above-mentioned three presidents lived in the House during his term of office. None of the presidents paid plaintiff any rent while so residing there, and all expenses of operating and maintaining the House were paid by plaintiff. It was plaintiff's policy to recognize the building as the private residence of its president and his family during his term of office, and visits to the House by members were not approved unless a specific invitation had been extended by the president in residence. The present controversy is concerned with the question whether or not the fair rental value of the House is excludable from the gross income of plaintiff's presidents.

The Commissioner of Internal Revenue determined that the fair rental value of the House should have been included in the gross income of the various presidents, and that plaintiff should have withheld income and F.I.C.A. taxes thereon for the years 1959 and 1960. The parties agreed that the fair rental value of the House during these years was $125 per month. The Commissioner of Internal Revenue thereupon assessed such withholding and F.I.C.A. taxes against plaintiff in the amount of $705, together with interest thereon in the amount of $42.89. No part of this $747.-89 in taxes and interest was actually deducted or withheld by plaintiff. After plaintiff paid these assessments and its claims for refund were disallowed, the present suit was timely filed.

It was found by our trial commissioner that plaintiff's presidents traveled extensively throughout the United States, visiting local and state organizations, in carrying out their responsibilities for supervision of all of plaintiff's affairs. During the years here in issue, roughly one-half of a president's time was spent in Tulsa actively directing plaintiff's various programs and the other half of his time was spent in traveling. While in Tulsa, plaintiff's presidents worked during both the day and night. There is an office in the House which the presidents used at night for the purpose of conducting staff meetings and briefings by subordinate officials. In addition, the presidents used the House for official entertainment connected with plaintiff's business.

The trial commissioner concluded that the evidence established that for the convenience of plaintiff, and as a condition of a president's tenure, he was, as a practical matter, required to live in the House. The trial commissioner further found that the House constituted a part of the business premises of plaintiff. Defendant disputes each and every one of these conclusions. However, we agree with the conclusions of the trial commissioner.

The Government contends that, because of the broad scope of § 61 of the 1954 Code, the fair rental value of the House constituted income to plaintiff's presidents unless such income was excludable under § 119. It is the Government's position that the fair rental value of the House was not excludable under § 119 because none of the three require-

ments under that section was met. Therefore, the Government concludes that the fair rental value of the House constituted income to plaintiff's presidents and that plaintiff should have withheld income and F.I.C.A. taxes thereon.

■ Section 119 of the Internal Revenue Code of 1954 provides in part:

"There shall be excluded from gross income of an employee the value of any meals or lodging furnished to him by his employer for the convenience of the employer, but only if—

\* \* \* \* \* \*

"(2) in the case of lodging, the employee is required to accept such lodging on the business premises of his employer as a condition of his employment."

Thus, there are three conditions which must be met if the value of the lodging furnished an employee by his employer are to be excluded from the employee's gross income: The lodging must be furnished for the convenience of the employer; the employee is required to accept such lodging as a condition of his employment; and the lodging must be on the business premises of the employer. In determining the applicability of § 119, the intention of the employer (whether or not he regarded the fair rental value of the lodging furnished to be compensation) is not particularly important. Indeed, both the Senate and House Committee Reports in discussing § 119 of the 1954 Code contain an example, which is now Example 3 in Treas. Regs. § 1.119–1 (d), showing that even when the employer regarded the lodging furnished to be a part of the employee's compensation, the employee would nevertheless be entitled to exclude the value of such lodging from his gross income if the conditions of § 119 are otherwise met. Further, § 119 itself provides that in determining whether meals or lodging are furnished for the convenience of the employer, "the provisions of an employment contract or of a State statute fixing

terms of employment shall not be determinative of whether the meals or lodging are intended as compensation." Therefore, we conclude that the Congress intended that an objective test should be used in applying § 119.

There does not appear to be any substantial difference between the first two conditions of § 119: The "convenience of the employer" test and the "required as a condition of his employment" test. The Senate Committee Report accompanying the 1954 Code defined the phrase "required as a condition of his employment" to mean "required in order for the employee to properly perform the duties of his employment." S.Rep.No.1622, 83d Cong., 2d Sess. 190 (1954), 3 U.S.C. Cong. & Ad.News (1954), pp. 4621, 4825. On the other hand, the Commissioner of Internal Revenue has said that:[2]

"As a general rule, the test of 'convenience of the employer' is satisfied if living quarters or meals are furnished to an employee who is required to accept such quarters and meals in order to perform properly his duties."

See Diamond v. Sturr, 221 F.2d 264, 266 (2d Cir. 1955); and Stone v. Commissioner, 32 T.C. 1021, 1024 (1959). Although the last quoted definition was issued before the promulgation of the 1954 Code, it is at least indicative of the meaning of the phrase used by the Congress. Furthermore, the only post-1954 case cited by the Government as bearing on the "convenience of the employer" test supports the above interpretation of the 1954 Code. Olkjer v. Commissioner, 32 T.C. 464 (1959).

■■ The issue of whether or not the lodging was furnished for the convenience of the employer, or whether the employee was required to accept the lodging in order to properly perform his duties, is primarily a question of fact to be resolved by a consideration of all the facts and circumstances of the case. Olkjer v. Commissioner, supra; Stone v. Commissioner, supra. Under the facts of the

2. Mim. 5023, 1940–1, Cum.Bull. 14.

present case we believe that the use of the House was furnished to plaintiff's presidents for the convenience of plaintiff. These presidents were elected for a term of one year each, and they may not succeed themselves in office. They came from all parts of the country. During their one year in Tulsa they were away half of the time. In these circumstances, it is not unreasonable to suppose that some of them would, for their temporary stay in Tulsa, rent living quarters not suitable for purposes of plaintiff's official activities.

Plaintiff's business is devoted primarily to organizing and promoting interest and activity on the part of young men in the affairs of their community, state and Nation. It is common knowledge that such a business requires constant staff meetings and official entertainment. Furthermore, plaintiff's presidents were away from Tulsa half of the time during their term in office. Consequently, when a president is back in Tulsa he must quickly catch up with his administrative duties and plan his future trips. These appear to be the reasons why the presidents frequently worked and entertained at night. Since the work and entertainment were plaintiff's business activities, plaintiff was responsible for providing suitable space for their proper execution. In light of these facts we believe that it was not unreasonable for plaintiff to permanently rid itself of the problem by furnishing its presidents with quarters where they could carry out the required work and entertainment at night.

The Government apparently does not dispute that plaintiff's official functions required access to a place such as the House. What the Government seems to be saying is that other suitable residences were available in the Tulsa area and so it was not necessary for plaintiff to furnish its presidents with the House for the proper performance of plaintiff's functions. The Government appears to be contending that § 119 does not apply unless *the* furnished lodging was so necessary to the performance of the duties of the employment that the absence of the specific lodging would render the performance virtually impossible.

We do not think that such a strict construction of § 119 is warranted. There are few instances in life where such an abstract concept of necessity would be met. Even in the cases cited by the Government,[3] where the employment was at a construction jobsite 40 miles from Anchorage and so the meals and lodging furnished to the employees were allowed to be excluded, it would presumably be possible for the employer to require the employees to furnish their own housetrailers to live near the jobsite. We believe that § 119 should be given a reasonable interpretation. It seems to us that the "required as a condition of his employment" test is met if, due to the nature of the employer's business, a certain type of residence for the employee is required and that it would not be reasonable to suppose that the employee would normally have available such lodging for the use of his employer. Of course, the employee is incidentally benefited by the furnished lodging, but as the Tax Court has observed in the Olkjer and Stone cases, supra, this is true in all cases where desirable working facilities as well as living quarters are concededly furnished "for the convenience of the employer."

Finally, § 119 requires that the lodging furnished must be on the business premises of the employer. The trial commissioner found that the House constituted a part of the business premises of plaintiff because plaintiff's official functions were carried out there at night. The Government argues that the residential character of the House is not transformed by the limited use of the House for purposes connected with plaintiff's activities. We think that the business premises of § 119 means premises of the employer on which the duties of

---

3. Olkjer v. Commissioner, 32 T.C. 464 (1959); Stone v. Commissioner, 32 T.C. 1021 (1959).

the employee are to be performed. Thus, a domestic servant who lives in the residence of this employer, and who is required to be available for duty at any time, may exclude the value of his lodging from his gross income even though the residence may or may not be the employer's "business premises." I.T. 2253, V–1 Cum.Bull. 32 (1926). In the present case, part of plaintiff's official activities were carried out at the House which it owned. We believe that the House is part of the business premises of plaintiff within the meaning of § 119 of the 1954 Code. See Anderson v. Commissioner, 42 T.C. No. 25, decided May 20, 1964.

During the oral argument the Government's counsel cited the cases of John L. Nolen, P–H Tax Ct.Mem. ¶ 64,099 (1964); and Atlanta Biltmore Hotel Corporation, P–H Tax Ct.Mem. ¶ 63,255 (1963).[4] The Nolen case involved a medical receptionist who was required to live on the second floor of the office of her employer so that she could answer telephone calls from patients and pharmacists after the normal office hours and perform other duties on the employer's premises, including storing and caring for perishable medicines. The Tax Court held that Mrs. Nolen was entitled to exclude the fair rental value of the lodging from her gross income. Similarly, in our present case, the use of suitable space is essential to the proper performance of the job. In the Atlanta Biltmore case, supra, the Tax Court held that an apartment with a fair rental value of $550 per month furnished to an employee of the hotel does not qualify under § 119. The facts of that case are clearly distinguishable from the instant case in that the employee in Atlanta Biltmore performed no services for the employer by residing in the apartment.

For the above reasons we hold that the fair rental value of the House was excludable, under § 119 of the 1954 Code, from the gross income of plaintiff's presidents. Plaintiff is therefore entitled to recover. The amount of recovery will be determined under Rule 47(c) (2).

## FINDINGS OF FACT

The court, having considered the evidence, the report of Trial Commissioner Lloyd Fletcher, and the briefs and argument of counsel, makes findings of fact as follows:

1. The plaintiff herein, The United States Junior Chamber of Commerce is, and was at all times material to this controversy, a nonprofit corporation, incorporated under the laws of the State of Missouri. It was organized for "such educational and charitable purposes as will promote and foster the growth and development of young men's civic organizations in the United States and its territories, designed to inculcate in the individual membership of such organization a spirit of genuine Americanism and civic interest and as a supplementary educational institution to provide them with opportunity for personal development and achievement and an avenue for intelligent participation by young men in the affairs of their community, state and nation and to develop true friendship and understanding among young men of all nations." Among its activities are such programs as the promotion of interest in youth athletic programs, safe driving programs, and community and school development programs.

2. The headquarters and principal offices of plaintiff are located in Tulsa, Oklahoma, where it owns and maintains a modern office building located at 4 West Main Street and a residential building located at 4332 South Atlantic Avenue. The latter property is known as the "U.S. Jaycee White House" (hereinafter referred to as the "White House"), and it is the official residence and home of the president of the plaintiff during his one-year term of office. It is distant about

4. The Government also cited the case of Leonard F. Longo, P–H Tax Ct.Mem. ¶ 64,054 (1964). That case concerned the deductibility of certain moving and relocation expenses paid by an employer to a new employee, and it is not pertinent to the issues in the present case.

three miles from the office building at 4 West Main Street.

3. The president of the plaintiff is its chief executive officer and is elected at the annual meeting by a majority vote of plaintiff's membership. He must be a member of plaintiff, is elected for a term of one year only, and may not succeed himself in office. During the years involved herein, Robert Cox, Robert Clark, and Morgan Doughton served successively as presidents of plaintiff. At the time of his election to the presidency, Cox lived in Chapel Hill, North Carolina, and was a partner in a clothing store; Clark lived in Des Moines, Iowa, where he was employed by the Iowa Power and Light Company; and Doughton resided in Allentown, Pennsylvania, where he was the owner and operator of his own business. At the expiration of their respective terms of office, each president returned to his respective residence and employment. The term "president" as used hereinafter refers equally to all of these men, there being no distinction between their living conditions, official activities, and relationship to the plaintiff.

4. The president receives no salary for his services. He is entitled to reimbursement for all travel and other miscellaneous expenses incurred while traveling on official business plus a *per diem* of $5.00. In addition, the by-laws of plaintiff provide for the president's expenses under a provision reading, in pertinent part, as follows:

"Because of the benefits and convenience accruing to the Corporation by having the President and his family, if any, reside in Tulsa in the home built by the Corporation for the President, the President and his family shall reside at the U. S. Jaycee White House in Tulsa, during his tenure of office. To reimburse the President for his expenses in excess of those covered by Policy 26–9–A such as extra service charges, gratuities, meals and miscellaneous expenses above the $5.00 per diem, excessive cleaning and laundry expenses, his expenses for his wife, family or other persons traveling with the President on official Corporation visitations all to the benefit of the Corporation, for expenses of maintaining the Jaycee White House, the President shall be allowed an expense allowance not to exceed $7,-000 per year. Such expense allowance shall be requisitioned by the President at his pleasure provided, however, that the total amount requisitioned at the end of the first three months shall not exceed $1,-750; $3,500 at the end of the first six months and $5,250 at the end of the first nine months."

5. In keeping with the aforesaid requirement of the by-laws, each of the above-mentioned presidents lived in the White House during his term of office. While so residing in the White House, none of the presidents has paid plaintiff any rent therefor. All expenses of operating the White House, such as maintenance, repairs, insurance premiums, taxes, utilities, and the like, are paid by plaintiff, and it is plaintiff's policy to recognize the building as the private residence of its president and his family during his term of office. Visits to the White House by members are not approved unless a specific invitation has been extended by the president in residence. The plaintiff does not intend that the right of its president to live in the White House shall be considered as compensation to him.

6. In the execution of his responsibilities for supervision of all the affairs of the plaintiff, the president is required to travel extensively throughout the United States visiting local and state organizations. However, about one-half of his time is spent in Tulsa, actively directing plaintiff's various programs. The burdens of the office are such that presidents of the plaintiff are required to work both during the day and night. He has an office both in the headquarters building and in the White House. He uses the White House office only at night for the purpose of conducting staff meetings and briefings by subordinate officials. In

addition, the president uses the White House for purposes of official entertainment of personnel connected with plaintiff's sponsors, members of plaintiff's finance and executive committees, its board of directors, past presidents of plaintiff, and presidents of affiliated international organizations.

7. The record establishes that, for the convenience of the plaintiff, it is necessary that its president reside in Tulsa, Oklahoma. It would not be necessary for the president to live in the White House during his term of office so long as he lived in the Tulsa area. Nonetheless, the testimony and documentary evidence establishes that for the convenience of the plaintiff, and as a condition of the president's tenure, he was, as a practical matter, required to live in the White House. The record further establishes that, as its presidents' home and nighttime office, and as its place for official entertainment, the White House constitutes a part of the business premises of the plaintiff.

8. The parties are in agreement that the fair rental value of the White House during the years in question was $125 per month. They are in disagreement as to the proper treatment of such fair rental value to plaintiff's president for income tax purposes. The Commissioner of Internal Revenue determined that such fair rental value of $125 per month should have been included in the income of the various presidents, and that plaintiff should have withheld income and F.I.C.A. taxes thereon for all quarters of 1959 and 1960. He thereupon assessed against plaintiff such withholding and F.I.C.A. taxes in the amount of $705, together with interest thereon in the amount of $42.89. No part of the said $747.89 in taxes and interest was deducted or withheld by plaintiff.

9. Plaintiff paid to defendant the aforesaid sum of $747.89, and on March 24, 1961, plaintiff duly filed timely refund claims with the District Director of Internal Revenue, Oklahoma City, Oklahoma, alleging that it had erroneously paid the aforesaid withholding and F.I.

C.A. taxes and interest. Plaintiff's said claims for refund were disallowed in full by the District Director on October 20, 1961, and this suit was timely filed thereafter.

10. No other action has been had on said claims in Congress or by any other department; no person other than the plaintiff is the owner thereof or interested therein; and no assignment or transfer of this claim, or any interest therein, has been made.

### CONCLUSION OF LAW

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover and judgment is entered to that effect. The amount of recovery will be determined pursuant to Rule 47(c) (2).