Forster Mfg. Co., Inc. v. Commissioner.
Forster Mfg. Co. v. Commissioner
Docket No. 5021-69.
United States Tax Court
T.C. Memo 1972-138; 1972 Tax Ct. Memo LEXIS 119; 31 T.C.M. (CCH) 647; T.C.M. (RIA) 72138; June 27, 1972
Carl F. Bauersfeld, for the petitioner. Alan I. Weinberg, for the respondent. STERRETT
Memorandum Findings of Fact and Opinion STERRETT, Judge: The Commissioner determined deficiencies in petitioner's Federal income tax as follows: Taxable Year
Amount
August 31, 1965
$5,144.02
August 31, 1966
3,888.05
*120 Due to concessions, the only issue remaining for adjudication is whether petitioner, Forster Mfg. Co., Inc., is entitled to deduct as an ordinary and necessary business expense the net expenses [1] incurred in operating and maintaining two homes, one of which was rented to its president, general manager and majority shareholder, and the other which was rented to the president's son, a director and district sales manager of petitioner. [2]
Findings of Fact Some of the facts have been stipulated. The stipulation, together *121 with the exhibits attached thereto, are incorporated herein by this reference. Forster Mfg. Co., Inc. (hereinafter referred to as petitioner) is a corporation organized under the laws of the State of Maine with its principal office in Wilton, Maine. It filed United States corporate 648 income tax returns for the taxable years ended August 31, 1965, and August 31, 1966, with the district director of internal revenue at Augusta, Maine. Petitioner is in the business of manufacturing and selling woodenware and plasticware products. Woodenware products consist primarily of toothpicks, clothespins, ice cream sticks, wooden spoons and forks, cocktail stirrers, tongue depressors, and similar flat items. It also manufacturers a line of larger woodenware products including croquet sets, rolling pins, furniture legs, etc. The line of plasticware products consists of plastic cutlery. Petitioner is the largest producer of woodenware products. Petitioner's principal manufacturing plant is located at Wilton, Maine, which since 1961 has been the site of its general administrative offices. Prior to that time, specifically 1951 to 1961, petitioner's principal location was Farmington, Maine. *122 Petitioner operates additional plants in East Wilton, Strong, Stratton and Mattawamkeag, Maine. The Wilton office is 80 miles from Portland and 180 miles from Boston, Massachusetts. Wilton's population totals approximately 3,800. Petitioner sells its products throughout the United States and in foreign countries as well. Its distribution system consists of a central warehousing operation in Wilton, and 20 additional warehouse locations throughout the country. It has approximately 100 sales representatives situated in various parts of the country. These representatives are independent contractors who solicit orders for petitioner on a commission basis. Petitioner also sells its products directly to large users such as D.C.A. Food Industries, Eskimo Pie Corp., etc. During the years in issue petitioner employed between 900 and 1,000 people. In 1951 petitioner purchased certain real estate, referred to as the Leavitt property, located on Bass Hill in Wilton, for $41,000. It was acquired to provide housing for petitioner's president and general manager. The Leavitt property consisted of a 25,000 square foot lot. Located thereon was a frame single family dwelling (hereinafter sometimes *123 referred to as the Leavitt house or main house) and a guest house. The main house contained a basement, and a living room, dining room, den and a bedroom on the main floor, five bedrooms on the second floor and an attached garage. The guest house included a living roomdining room combination, two bedrooms, kitchenette, and an unattached two-car garage with a utility room or tool shed. [3]
From its initial acquisition in 1951 through 1953 the Leavitt house remained unoccupied. In 1952 petitioner offered to rent it to William F. Woodside (hereinafter referred to as Woodside), petitioner's assistant treasurer. Woodside declined the offer as he was living in a company house in Farmington, where petitioner's general offices were then located, and he did not wish to incur the additional expense in living in Wilton, some 10 miles away. Since 1953 petitioner has rented the Leavitt house to Theodore R. Hodgkins [4] (hereinafter referred to as T. R. Hodgkins) president, general manager *124 and majority shareholder of petitioner from at least 1951 through the years in issue. [5] During 1965 and 1966, T. R. Hodgkins paid a monthly rental of $195, totaling $2,340 per year. The annual fair rental value of said property during such period was $2,400 per annum. Hodgkins was also liable for the payment of the various utility costs incurred. Petitioner paid all other expenses in caring for the property including insurance, taxes, repairs and caretaker labor costs. It also purchased numerous capital items used within the house including the following: Date
Item Acquired
Acquired
Cost
Heating equipment
1955
$ 87.50
Parking area
1956
250.00
Heater
1957
322.14
Refrigerator
1959
554.00
Dishwasher
1959
274.92
2 chaise lounges and chairs
1959
91.40
Kitchen improvements
1960
3,499.41
Table
1960
262.85
Ceiling fan
1960
38.06
Aluminum door
1960
52.11
Washer-dryer
1961
223.00
Hot water heater
1962
225.00
Rugs
1962
2,775.00
Tea service
1962
75.00
Stove
1962
225.00
Oriental rug
1962
2,000.00
Bed
1964
148.50
Dishwasher
1964
321.17
Washer
1964
442.00
Air conditioner
1966
1,645.00
Sprinkler system
1966 1,965.53
Total $15,477.59
*125 649 The property was used at least primarily to provide housing for T. R. Hodkins. Charles H. Burton (hereinafter referred to as Burton) in 1953 and 1955, was offered a position with petitioner as president and general manager. The employment offer included Burton's right to rent the Leavitt house. Petitioner and Burton could not agree to terms and therefore Burton declined the offers. In 1960 the Leavitt house was offered to William Howard (hereinafter referred to as Howard), who had become petitioner's general manager. Howard wished eventually to purchase the residence with which he was provided and the company did not want to sell the main house. Therefore petitioner purchased a residence known as the Goodspeed property *126 which it rented to Howard with an option to buy. In 1970 the Leavitt property was offered to William H. Hushing, who had become petitioner's president. [6]
The Goodspeed property was purchased by petitioner for $40,000. It too was situated on Bass Hill in Wilton. It consisted of a 10-acre tract of land including an orchard and wooded area. Located thereon was a two-story single family frame dwelling (hereinafter sometimes referred to as the Goodspeed house), attached garage, a tennis court, a four-car unattached garage and a barn. The Goodspeed house contained 17 rooms, seven on the first floor; eight on the second and two on the third. [7]
The Goodspeed house was rented to Howard from September 1960 until termination of his employment in December of 1963, at a monthly rental of $150. During this period Howard paid the utility bills and petitioner incurred the expense for care and maintenance of the property, including taxes, *127 insurance and caretaker's services. Since 1963 the Goodspeed house has been rented to David L. Hodgkins (hereinafter referred to as David), son of T. R. Hodgkins, at a monthly rental of $150, totaling $1,800 per year. He was also responsible for utility costs incurred and the caretaker's salary. Petitioner paid the remaining expenses. During the years in issue David was petitioner's district sales manager and a director of the company. The fair rental value of the Goodspeed house in 1965 and 1966 was $1,800 per annum. The property, during the years before us, was used at least primarily to provide housing for David Hodgkins. Petitioner encountered difficulty in attracting qualified personnel because of its rural location and the scarcity of suitable housing in the area. For this reason petitioner acquired residential properties which it generally sold but on occasion rented to prospective executives. The following shows all homes acquired by petitioner since 1945: Year of
Purchase
Plant Location
Purchase Price
1945
Strong Maine
- Day
$ 2,450.00
1945
Strong Maine
- Lake
4,000.00
1946
Strong Maine
- Kirchner
6,000.00
Sold 1964
1946
Strong Maine
- Merchant
4,500.00
Sold 1953
1946
Strong Maine
- Davis
6,500.00
Sold 1963
1946
Farmington
- Herman
6,000.00
Sold 1954
1948
Mattawamkeag
- Mill
3,782.15
1951
Wilton
- Leavitt
41,000.00
1952
Mattawamkeag
- Schedd
4,300.00
Sold 1957
1952
Mattawamkeag
- McGinley
2,800.00
Sold 1956
1952
Mattawamkeag
- Burr
6,000.00
Sold 1956
1952
Mattawamkeag
- Calden
3,000.00
Sold 1954
1952
Mattawamkeag
- Wyman
6,698.56
Destroyed by fire in 1966
1953
Mattawamkeag
- Severance
4,700.00
Sold 1956
1955
Mattawamkeag
- Dyer
3,800.00
Sold 1970
1956
Mattawamkeag
- Green
3,500.00
Sold 1961
1958
Mattawamkeag
- Stratton
5,000.00
Sold 1960
1959
Mattawamkeag
- Archer
4,500.00
Sold 1963
1960
Wilton
- Goodspeed
40,000.00
1964
Wilton
- Butler (Gould cottage)
35,000.00
1964
Wilton
- North
15,000.00
1970
Mattawamkeag
- Nicholson
18,000.00
*128 650 Petitioner, during the period here involved, conducted a guest program whereby its customers and sales representatives were invited to Wilton for the purpose of touring and inspecting the company's facilities, manufacturing operations and attending sales meetings. In connection with this program petitioner provided its visitors with lodging, meals, entertainment and recreational activities. Due to the inadequate accommodations in the Wilton area guests were housed at various cottages owned by petitioner, including the Wilson Lake cottage, [8] Gould cottage (also known as Butler house) and Leavitt guest cottage. However, he Gould and Leavitt cottages were used primarily as temporary homes for new executives that were coming into the firm; petitioner would rent them for periods of 3 to 6 months. When not so rented the available rooms would house company guests. In addition to the Leavitt and *129 Goodspeed homes petitioner, during the years in issue, owned six other houses all of which produced losses except one; the Wyman house. [9] Four of these homes, the Day, Lake, Wyman and Company houses were apparently rented year-round to company executives. The Butler and North houses were either rented for short periods to new executives or were used in the guest program. The North house was rented for only a short period as it was completely renovated during the years before us. A summary of the figures may be reflected as follows: Day House
Lake House
Wyman House
Company House
Butler House
North House
1965:
Expense
$ 762.03
$ 639.72
$ 730.00
$ 611.77
$3,619.78
$1,844.49
Income 705.00
636.00
513.90
540.00
900.00
0
Profit or (Loss)
$ (57.03)
$ (3.72)
$ (216.10)
$ (71.77)
[2,719.78)
[1,844.49)
1966:
Expense
$ 901.91
$ 602.79
$ 371.09
$ 639.93
$3,571.53
$2,857.21
Income 720.00
576.00
530.84
540.00
1,800.00
350.00
Profit or (Loss)
$ (181.91)
$ (26.79)
$ 159.75
$ (99.93)
[1,771.53)
[2,507.21)
*130 During the years in issue T. R. Hodgkins owned a residence in Wilton which he rented to his sister. His wife owned the Wilson Lake cottage which she rented to petitioner. David Hodgkins owned a cottage on Clearwater Lake, approximately 15 miles from Wilton. He also owned some unimproved lots in Wilton. The notice of deficiency, prior to adjustment, reflects the following: 651 Leavitt House:
August 31, 1965
August 31, 1966
Expenditures claimed
Labor
$5,474.8
$ 3,144.26
Insurance
250.27
250.27
Taxes
594.57
572.33
Repairs
1,462.78
1,020.42
Depreciation 2,163.40
2,341.28
$9,945.90
$7,328.56
Less Rent
$2,340.00
$2,340.00
Taxes 454.68
389.59 2,794.68
2,729.59
Expenses Disallowed $7,151.22
$4,598.97
Goodspeed House:
August 31, 1965
August 31, 1966
Expenditures claimed
Labor
$2,149.78
$ 2,394.45
Insurance
153.00
153.00
Taxes
1,162.81
1,119.32
Repairs
1,999.88
666.04
Depreciation 1,155.14
1,164.14
$6,620.61
$5,496.95
Less Rent
$1,800.00
$1,800.00
Taxes 846.01
752.12
2,646.01
2,552.12
Expenses Disallowed $3,974.60
$2,944.83
*131 Ultimate Findings of Fact The Leavitt house and Goodspeed house, during the years in issue, were assets held for the personal benefit of petitioner's principal shareholder and his son. Opinion In 1951 petitioner purchased the Leavitt house. From 1953 through the years in issue the house was rented to T. R. Hodgkins, petitioner's president, general manager and majority shareholder. The rent paid approximated the fair rental value of the property. In 1960, petitioner, in compliance with an employment agreement, purchased the Goodspeed house and rented it to Howard, an executive of the company. Following Howard's disengagement from petitioner in 1963, David L. Hodgkins, son of T. R. Hodgkins and a director and sales manager of the company, moved into the house. The rent paid by David was equivalent to the fair rental value. The expenditures incurred by petitioner in caring for and maintaining the two homes exceeded the rent received. The issue presented for adjudication relates to whether petitioner is entitled to deductions for depreciation and upkeep, within the provisions of section 167 and 162, I.R.C. 1954, [10] to the extent that they exceed the rent received. Petitioner *132 does not argue that the excess expenses are deductible as additional compensation to the occupants of two houses, and hence we are precluded from an analysis of the deductibility issue on that ground. The sole question to be considered in deciding the issue at hand is whether ownership and maintenance of the realty related primarily to personal or to business purposes. Such an issue requires a determination of fact and the burden of proof rests on the petitioner. Louis Greenspon, 23 T.C. 138 (1954), *133 aff'd on this issue 229 F. 2d 947 (C.A. 8, 1956); Louis Boehm, 35 B.T.A. 1106 (1937). Of further 1 significance is the fact that here we have 652 a corporation taking deductions for expenditures on the private home of its dominant shareholder and chief executive, as well as on the home of the majority stockholder's son. "In such circumstances the proof should be very clear and very certain that the expenses charged to the corporation were legitimate business expenses of the corporation. Otherwise, the opportunity for abuse would be great." Louis Greenspon, supra, at 151. We have considered the facts presented and conclude that during the years in issue the two houses in question were not employed primarily for business purposes, but rather were assets used predominantly for the personal benefit of petitioner's principal shareholder. In support of this conclusion we note initially that during the years before us both the Leavitt and Goodspeed homes were used generally, if not exclusively, as the personal residences of T. R. Hodgkins and David L. Hodgkins, petitioner's controlling stockholder and his son. See Transport Mfg. & Equipment Co. v. Commissioner, 434 F. 2d 373 *134 (C.A. 8, 1970), affirming a Memorandum Opinion of this Court; International Trading Co. v. Commissioner, 275 F. 2d 578 (C.A. 7, 1960), affirming a Memorandum Opinion of this Court; Reynard Corporation, 30 B.T.A. 451 (1934). Petitioner contends however that the structures in issue qualify as business property because (1) they were acquired to attract prospective executives to accept employment with petitioner; (2) both homes were employed to entertain and house company guests; (3) the Leavitt house was a showplace used to impress customers and promote business; and (4) the rent paid was equivalent to the properties' fair rental value. In regard to petitioner's first assertion, we can appreciate the necessity in certain instances to purchase housing to attract qualified executives. Cf. section 119 and the cases cited thereunder. See also United States Junior Chamber of Commerce v. United States, 334 F. 2d 660 (Ct. Cl., 1964). In such a situation the expenditures incurred may very well qualify as a business expense. [11] However, in the instant case the property in issue, during the years before us, was occupied by petitioner's principal shareholder *135 and his son, both of whom owned other homes in the area and did not have to be persuaded or lured to Maine to accept positions of employment. We further note that the nonbusiness character of the use of the Goodspeed house during the years in issue is not altered by the circumstances which led to its acquisition. Rather, to the extent the prior occupancy possibly gave the house the color of business use, the hue clearly faded upon the executive's severance from the company, and the building assumed a new tone on David's occupancy; that of an asset held for the personal benefit of its tenant. Cf. Gevirtz v. Commissioner, 123 F. 2d 707 (C.A. 2, 1941); Gilbert Wilkes, 17 T.C. 865 (1951); R. C. Bayliss, 35 B.T.A. 1128 (1937). Compare Andrew F. McBride, Jr., 50 T.C. 1, 10 (1968). [12]
*136 The Leavitt house, on the other hand, involved no such alteration; from 1963 through the years in issue T. R. Hodgkins was the property's only tenant. [13]
As to petitioner's second contention, we can find little, if any, substantive evidence 653 in the record which would demonstrate the properties' use in entertaining or housing company guests.[14] However, even if we were to concede such implementation [15] it would at best be only incidental to the properties' principal use, the housing of two corporate executives. Such an insignificant business application does not qualify the expenditures incurred therein as ordinary and necessary business expenses. We find support for this position in Commissioner v. Doyle, 231 F. 2d 635 (C.A. 7, 1956), affrming a Memorandum Opinion *137 of this Court, wherein the Court commenting upon the latitude to be given to the phrase "ordinary and necessary expense" albeit in another context, stated: We construe the statutory words "ordinary and necessary expenses" to mean those expenses which economically are an integral part of a business * * *. Integrality is the test. Disbursements which fail to meet this test, although they may be concomitants to the business as operated by some persons, are not ordinary and necessary expenses thereof within the meaning of * * *. [Emphasis supplied.] Additionally, in Greenspon, supra, this Court stated: However, even if there were proof in the record of the extent to which the farm was used to entertain business guests, we could not allow deduction of the particular expenses which have been charged to the corporations here. We think that it is too remote *138 and too extraordinary to classify expenditures for farm tools, fertilizers, shrubbery, etc. as promotional expenses or as entertainment expenses. See also International Artists, Ltd., 55 T.C. 94, 104 (1970). In Greenspon, supra, the Tax Court, faced with the precise issue raised by petitioner's third assertion, stated: Nor are we able to accept the contention that these expenses are justified because the farm was developed as a sort of horticultural showplace to impress potential customers. The relationship between the aesthetic stimulation of a potential customer from the view of an unusual array of shrubbery and flowers and his order for pipe is much too oblique. [16]
Relying on the above quoted language it is apparent that even if we were to determine that the Leavitt house was in fact a "showplace" this would not permit the characterization of expenses incurred therein as business *139 deductions, but rather would necessitate a further demonstration of a connection between such property and petitioner's business. We find no such connection between the care of a home and the production of woodenware products. Petitioner's final argument is also not well founded. The payment of the fair rental value by the tenants does not convert the properties' character from personal to business use. [17] See International Trading Co. v. Commissioner, supra, wherein the Court stated: True, the Tax Court found that under the circumstances the fair rental values of the premises for the time the families made use of the property were not in excess of the rentals they paid. Still this does not overcome the court's finding that the property had little or no business use and was maintained primarily for the personal use of the stockholders, and thus, implicity, any expenses incurred in its maintenance were not in connection with its trade or business. *140 At best its only result is to prevent constructive dividend treatment to such tenants. Compare United Aniline Co. v. Commissioner, 316 F. 2d 701, 705 (C.A. 1, 1963), affirming a Memorandum Opinion of this Court; Nicholls, North, Buse Co., 56 T.C. 1225, 1240 (1971); International Artists, Ltd., supra, at 108 with International Trading Co., supra, T.C. Memo. 1958-104. Lastly we note that petitioner has failed to assert that the property in issue was held for the production of income. In light of the facts presented we find its decision 654 to exclude such contention a reasonable one. See Samuel Yanow, 44 T.C. 444, 452-3 (1965), affd. per curiam 358 F. 2d 743 (C.A. 3, 1966). Upon an examination of the entire record we conclude that the expenditures incurred and depreciation deductions claimed to the extent they exceed rent received on the property in issue are disallowed. Decision will be entered under Rule 50. Footnotes
1. Respondent concedes that petitioner is entitled to deduct expenses and depreciation to the extent of rental income produced plus property taxes. ↩
2. The notice of deficiency disallowed expenses incurred in maintaining the two homes, and thereby increased taxable income in the following amounts: Leavitt House
Goodspeed House
8/31/65
8/31/66
8/31/65
8/31/66
$7,151.22
$4,598.97
$3,974.60
$2,944.83
Expenses disallowed per notice of deficiency. Through amendment of the notice of deficiency such amounts have been reduced and may be presently reflected as follows: ↩
$6,864.92
$4,592.08
$4,002.25
$3,000.13
3. The record presented indicates that respondent is only contesting the business character of the main house; he concedes the deductibility of expenditures incurred in the guest house and unattached garage.↩
4. From 1943 to 1953, Theodore R. Hodgkins lived with his former wife at 21 Court St., Farmington, Maine. In May of 1953 he was divorced. As part of the property settlement he transferred the Farmington home to his former spouse and moved into the Leavitt house. ↩
5. William Howard became general manager in 1960. However he retained such position only until February 1962 at which time he became sales manager. He left the company in December of 1963.↩
6. Whether Hushing has in fact rented the Leavitt house cannot be ascertained from the record.↩
7. It seems we are herein concerned only with the main house and the immediate surrounding area. The character of the additional property is not in issue.↩
8. Petitioner did not hold title to the Wilson Lake cottage. It was owned during the years in issue by Virginia G. Hodgkins, T. R. Hodgkins' spouse. However, petitioner paid substantially all expenses incurred therein and in addition paid Virginia Hodgkins $3,600 per year in rent.↩
9. The Wyman house produced a gain in 1966, prior to its destruction by fire; 1965 was a loss year.↩
10. All section references are to the Internal Revenue Code of 1954 unless otherwise indicated. The above noted sections state in part as follows: SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *. SEC. 167. DEPRECIATION. (a) General Rule. - There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - (1) of property used in the trade or business, or (2) of property held for the production of income.↩
11. Respondent, in the instant case, does not contest the expenditures incurred in maintaining the other homes owned by petitioner, which were in fact acquired to attract executives or house guests.↩
12. The cases cited above deal with an individual taxpayer's conversion of property held for the production of income to property held solely for personal reasons. This same theory of conversion has however been applied to corporations. See Richard R. Riss, Sr., 56 T.C. 388, 415 (1971), on appeal (C.A. 8, May 26, 1972) wherein this Court stated: Generally speaking, where property has been held for the personal use of a taxpayer, a deduction under * * * section 167(a)(2) * * * will be denied unless it can be shown that a conversion of the property occurred * * *. Usually, this question arises in the context of an individual taxpayer who has abandoned his place of residence, and who is seeking a deduction for the cost of maintaining that property prior to sale * * *. Hence, the case law that has developed in this area has centered around the activities of individual taxpayers. Whether these rules should be extended to a corporate taxpayer in a case such as the one now before us is a question which we believe must be answered in the affirmative.↩
13. We point out that petitioner's offering of the Leavitt house to various prospective executives does not, in this Court's opinion, alter the character of the property wherein the president, general manager and dominant shareholder remains the sole tenant of such property. Compare United States Junior Chamber of Commerce v. United States, 334 F. 2d 660, 662↩ (Ct. Cl., 1964).
14. We are herein referring only to the Leavitt main house. Respondent on brief apparently concedes the business character of the Leavitt guest house. ↩
15. In such event petitioner is still confronted with section 274 in regard to the properties' use as an entertainment facility, which burden has not been met.↩
16. The Eighth Circuit, in affirming this decision, stated: We find no cases authorizing the deduction of promotional expense which resulted in enhancing the value of the taxpayer's home. An allowance of this type would open the door to many questionable deductions.↩
17. The payment of fair rental value could indicate a profit motive on the part of the corporation in renting the property. However, as will be seen infra, petitioner raises no such contention and we find no such motive from the record presented.↩