**Faneuil ADAMS, Jr. and Joan P. Adams**

v.

**The UNITED STATES.**

No. 141–75.

United States Court of Claims.

Oct. 18, 1978.

John D. Heckert, Washington, D. C., for plaintiff; William P. McClure, Washington, D. C., atty. of record; Robert Feldgarden and McClure & Trotter, Washington, D. C., of counsel.

David C. Hickman, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant; Theodore D. Peyser, Jr., Washington, D. C., of counsel.

Before COWEN, Senior Judge, and DAVIS and BENNETT, Judges.

## OPINION

PER CURIAM: *

■ The issue in this tax refund suit is whether the fair rental value of a Japanese residence furnished the plaintiffs by the employer of plaintiff Faneuil Adams, Jr., is excludable from their gross income under Section 119 of the Internal Revenue Code of 1954.

Plaintiffs Faneuil Adams, Jr. and Joan P. Adams are husband and wife who filed joint federal income tax returns for 1970 and 1971 with the Office of the Director of the Office of International Operations, Internal Revenue Service, Washington, D. C. In 1970 and 1971, Faneuil Adams [hereinafter "plaintiff"] was president of Mobil

* This opinion incorporates that of Trial Judge C. Murray Bernhardt with some modification and supplementation by the court.

Sekiyu Kabushiki Kaisha ("Sekiyu"), a Tokyo-based Japanese corporation which was wholly owned by Mobil Oil Corporation ("Mobil"). During those years, Sekiyu employed about 1,500 persons in Japan with sales between $400–700 million each year. It had several thousand service stations in Japan and was also involved in two joint ventures with Japanese companies which owned and operated four refineries.

In order to attract qualified employees for foreign service and to maintain an equitable relationship between its domestic and American foreign-based employees, thereby preventing any employee from gaining a benefit or suffering a hardship from serving overseas, Mobil maintained a compensation policy for its American employees assigned outside the United States. One of the components of the policy involved the procurement by Mobil of housing for such employees, regardless of their position or duties. Mobil first calculated a "U.S. Housing Element" for each American foreign-based employee, based on a survey of the Bureau of Labor Statistics, which reflected the approximate average housing costs in the United States at various family sizes and income levels. Mobil then subtracted from that employee's salary the amount of his particular U.S. Housing Element. If Mobil provided housing to the employee, the employee would include in his gross income for federal tax purposes the U.S. Housing Element amount. If the employee instead obtained his own housing abroad, Mobil reimbursed him for the full amount, subject to certain predetermined limitations based upon reasonableness, and the employee would then include the full amount reimbursed in his gross income.

Pursuant to the above policy, Mobil provided plaintiff with a residence for the years in question. The three-level house, which was built and owned by Sekiyu, was 3 miles from headquarters and consisted of a large living room, dining room, pantry and kitchen, three bedrooms, a den, two bathrooms, two maid's rooms, two garage areas, and a garden and veranda. By American standards the house was not large, but it was apparently choice. Sekiyu

felt that it was important to house its chief executive officer in prestigious surroundings because, particularly in Japan, there is less of a distinction than in the United States between business activities and social activities. The effectiveness of a president of a company in Japan is influenced by the social standing and regard accorded to him by the Japanese business community. If the president of Sekiyu had not resided in a residence equivalent to the type provided the plaintiff, it would appear that he would have been unofficially downgraded and slighted by the business community and his effectiveness for Sekiyu correspondingly impaired. Sekiyu, therefore, provided such a house to plaintiff and required him to reside there as a matter of company policy.

The house was also designed so that it could accommodate the business activities of the plaintiff. The den was built specifically for the conduct of business, and the kitchen and living room were sufficiently large for either business meetings or receptions. Plaintiff worked in the house in the evenings and on weekends and held small meetings there for mixed business and social purposes. He regularly used the telephone for business purposes from his home after regular working hours, both for business emergencies and also for communicating with persons in the United States because of the time difference. In addition, he regularly discharged his business entertainment responsibilities in the residence, generally averaging about 35–40 such occasions in a normal year. In 1970 his entertaining declined considerably because of the absence of his wife from Japan for 10 months, but it resumed again in 1971. Plaintiff was provided with two maids, only one of whom was needed for his family's personal requirements.

Plaintiff included in his gross income for federal tax purposes, as the value of the housing furnished him by his employer, the U.S. Housing Element amounts which had been subtracted from his gross salary. Those amounts which were designed to approximate the average housing costs of a similarly situated person in the United

States during 1970 and 1971, totalled $4,439 for 1970 and $4,824 for 1971. However, because the cost of housing in Tokyo in those years was considerably higher than that in the United States, it is agreed by the parties that the fair rental value of the residence furnished plaintiff by Sekiyu was $20,000 in 1970 and $20,599.09 in 1971. Accordingly, upon audit of plaintiff's 1970 and 1971 income tax returns, the Internal Revenue Service, among other adjustments, increased the amounts reported by plaintiff as the value of the housing furnished by Sekiyu to $20,000 in 1970 and $20,599.09 in 1971. Plaintiff has filed suit to recover the sum of $914.24 plus assessed interest as a result of the Internal Revenue Service's inclusion in his gross income of the amounts in excess of the U.S. Housing Element for the 2 years in suit.

▪ Gross income means all income from whatever source derived, including compensation for services. I.R.C. § 61(a). It includes income realized in any form. Section 1.61–2(d)(1) of Treasury Regulations, T.D. 6888, 1966–2 Cum.Bull. 23, states, "If services are paid for other than in money, the fair market value of the property or services taken in payment must be included in income."

Presumably, then, if the lodging furnished to plaintiff was compensation to him, the fair rental value of the lodging would be includable in his gross income unless excludable under another provision of the Code. *See Comm'r. of Internal Revenue v. LoBue,* 351 U.S. 243, 76 S.Ct. 800, 100 L.Ed. 1142 (1956).

Plaintiff contends that the fair rental value of the residence supplied to him by Sekiyu in 1970 and 1971 is excludable from his gross income because of Section 119 of the 1954 Code. Alternatively, plaintiff asserts that the excess of the fair rental value of the residence over the U.S. Housing Element amount represented a benefit to his employer and not a benefit to him, and therefore is not gross income to him. Finally, plaintiff contends that even if the fair rental value of the residence is income to him, it should be measured by the amount plaintiff would have spent for housing in the United States, rather than the fair rental value in Japan. Because we hold that the conditions of Section 119 of the 1954 Code and the Regulations promulgated thereunder have been met, we do not address the other arguments of plaintiff.

Section 119 of the 1954 Code provides in part:

> There shall be excluded from gross income of an employee the value of any meals or lodging furnished to him by his employer for the convenience of the employer, but only if—
>
> \* \* \* \* \* \*
>
> (2) in the case of lodging, the employee is required to accept such lodging on the business premises of his employer as a condition of his employment.

Thus, in order to qualify for the exclusion of Section 119, each of three tests must be met:

> (1) the employee must be required to accept the lodging as a condition of his employment;
> (2) the lodging must be furnished for the convenience of the employer; and
> (3) the lodging must be on the business premises of the employer. [Treas.Reg. § 1.119–1(b) (1956).]

The Regulations further provide that the first test is met where the employee is "required to accept the lodging in order to enable him properly to perform the duties of his employment." *Id.*

It is clear that the first requirement of the statute has been met because the plaintiff was explicitly required to accept the residence provided by Sekiyu as a condition of his employment as president of the company. Sekiyu's goal was twofold: first, it wanted to insure that its president resided in housing of sufficiently dignified surroundings to promote his effectiveness within the Japanese business community. Secondly, Sekiyu wished to provide its president with facilities which were sufficient for the conduct of certain necessary business activities at home. Since at least 1954 Sekiyu had required that its chief executive

officer reside in the residence provided to plaintiff, as a condition to appointment as president.

With respect to this first test of Section 119, then, this case is as compelling as *United States Junior Chamber of Commerce v. United States*, 334 F.2d 660, 167 Ct.Cl. 392 (1964). In that case, the court found that it was not *necessary* for the taxpayer-president to reside in the Chamber's "White House" during his term of office so long as he lived in the Tulsa area. But, as a practical matter, for the convenience of his employer and as a condition of his tenure, the president was *required* to live there. Therefore, it was held that the "condition of employment" test was met. The court noted that the "condition of employment" test is met if

> due to the nature of the employer's business, a certain type of residence for the employee is required and that it would not be reasonable to suppose that the employee would normally have available such lodging for the use of his employer. 334 F.2d at 664, 167 Ct.Cl. at 399.

Here, because the size and style of one's residence had an important effect upon the Japanese business community, a certain type of residence was both required by Mobil and Sekiyu for the plaintiff and necessary for the proper discharge of his duties in Sekiyu's best interests.

In contrast, the Tax Court in *James H. McDonald*, 66 T.C. 223 (1976), found that the taxpayer was not expressly required to accept his accommodations as a condition of his employment in Tokyo. Moreover, the court noted that the apartment provided to the taxpayer was not integrally related to the various facets of the employee's position. In the present case, plaintiff was required to accept the housing, and the residence was directly related to plaintiff's position as president, both in terms of physical facilities and psychic significance. It is held, therefore, that plaintiff was required to accept the lodging in order to enable him properly to perform the duties of his employment.

As to the "for the convenience of the employer" test, in *United States Junior Chamber of Commerce v. United States*, 334 F.2d at 663, 167 Ct.Cl. at 397, the court stated,

> "There does not appear to be any substantial difference between the * * * 'convenience of the employer' test and the 'required as a condition of his employment' test."

Since it has already been determined that the condition of employment test has been satisfied, on that basis alone it could be held that the convenience of the employer test has also been met.

In *James H. McDonald, supra*, 66 T.C. at 230, the court stated that the convenience of the employer test is satisfied where there is a direct nexus between the housing furnished the employee and the business interests of the employer served thereby. In *McDonald*, the taxpayer was a principal officer of Gulf who was furnished an apartment by his employer which totalled only about 1,500 square feet of living space. The taxpayer was not required to live in the apartment, and it was found that the only benefit Gulf received in maintaining the apartment was the flexibility it afforded Gulf in personnel transfers. There was no prestige consideration. The court held that there was an insufficient nexus between the apartment and the employer's business interests to meet the convenience of the employer test requirements. Moreover, the court further noted that:

> While its practice of maintaining various leasehold interests for assignment to expatriate employees may have accorded Gulf a benefit in terms of flexibility in personnel transfers, that is not to conclude that the assignments of these lodgings to petitioners at a discount similarly served the interests of Gulf; that is, although convenience may have dictated the form in which the leasehold arrangements were structured, the convenience of Gulf did not require it to subsidize the assignments. 66 T.C. at 229.

Here there was a sufficiently direct relationship between the housing furnished the

plaintiff by Sekiyu and Sekiyu's business interests to meet the convenience of the employer test. The lodging had been built and was owned by Sekiyu. It was specially identified with the business of Sekiyu, for the house had served as the home of its presidents since at least 1954. If Sekiyu's president had not resided in housing comparable to that supplied plaintiff, Sekiyu's business would have been adversely affected.[1] The house had been designed for this purpose to accommodate substantial business activities, and therefore further served Sekiyu's business interests.

Moreover, the fact that Sekiyu subsidized plaintiff's use of the house was also in its best business interests. Sekiyu was interested in attracting a qualified person as its chief executive officer. Because of the unusual housing situation in Tokyo during the years in question, a person would have had to pay up to four times his U.S. housing costs to obtain comparable housing in Tokyo. Certainly, such a factor would have been a strong deterrent to any qualified person's interest in Sekiyu's presidency, absent a housing subsidy from Sekiyu. Furthermore, it was clearly in Mobil-Sekiyu's best business interests to maintain an equitable compensation relationship between its domestic employees and its American foreign-based ones. The housing subsidy was designed to accomplish that.

That the plaintiff also incurred a benefit from this residence and that it was, in part, a convenience to him, does not disturb the conclusion. As noted in *William I. Olkjer*, 32 T.C. 464, 469 (1959):

No doubt the facilities furnished benefited the employee also. The test which the statute provides, however, is that of convenience to the employer. There is no provision to the effect that the employee is to be deprived of his right to exclude from gross income the value of food and lodging otherwise excludable because he, too, is convenienced.

See also *United States Junior Chamber of Commerce v. United States*, 334 F.2d 660, 167 Ct.Cl. 392 (1964); *George I. Stone*, 32 T.C. 1021, 1025 (1959).

■ · The third and final test is whether the lodging was on the business premises of the employer. Observe first that "[t]he operative framework of [the clause 'on the business premises'] is at best elusive and admittedly incapable of generating any hard and fast line." *Jack B. Lindeman*, 60 T.C. 609, 617 (1973) (Tannenwald, J., concurring). This question is largely a factual one requiring a commonsense approach. The statute should not be read literally. As noted by the Tax Court in *Lindeman, supra*, 60 T.C. at 614:

[T]he statutory language ordinarily would not permit any exclusion for lodging furnished a domestic servant, since a servant's lodging is rarely furnished on "the business premises of his employer"; yet the committee report * * * shows a clear intention to allow the exclusion where the servant's lodging is furnished in the employer's home.

■ In the original version of the 1954 Code, as enacted in the House, the term that was used in Section 119 was "place of employment." The Senate changed the wording to "business premises", which was accepted by the House. However, the change was without substance, for the House Conference Report stated that "[t]he term 'business premises of the employer' is intended, in general, to have the same effect as the term 'place of employment' in the House bill." H.Conf.Rep. No. 2543, 83d Cong., 2d Sess. 27, *reprinted in* [1954] U.S. Code Cong. & Admin.News, pp. 5280, 5286. The pertinent Treasury regulation similarly provides that "business premises" generally refers to the place of employment of the employee. Treas.Reg. Sec. 1.119–1(c)(1) (1956). The phrase, then, is not to be limited to the business compound or headquarters of the employer. Rather, the emphasis

1. The Court of Claims has rejected the strict construction of Section 119 which would require the taxpayer to show that *the particular lodging furnished to him was for the conve-*nience of the employer. *United States Junior Chamber of Commerce v. United States*, 334 F.2d 660, 664, 167 Ct.Cl. 392, 399 (1964).

must be upon the place where the employee's duties are to be performed. *See Comm'r. of Internal Revenue v. Anderson,* 371 F.2d 59, 64 (6th Cir. 1966), *cert. denied* 387 U.S. 906, 87 S.Ct. 1687, 18 L.Ed.2d 623 (1967). In *United States Junior Chamber of Commerce v. United States,* 334 F.2d at 664–65, 167 Ct.Cl. at 400, the court stated, "We think that the business premises of Section 119 means premises of the employer on which the duties of the employee are to be performed." The phrase has also been construed to mean either (1) living quarters that constitute an integral part of the business property, or (2) premises on which the company carries on some substantial segment of its business activities. *Gordon S. Dole,* 43 T.C. 697, 707 (1965), *aff'd per curiam,* 351 F.2d 308 (1st Cir. 1965).

In *United States Junior Chamber of Commerce, supra,* the taxpayer-president had an office in the employer-owned "White House" which he used at night for the conduct of business meetings. In addition, he used his residence for business entertainment purposes. The court held that, because of these two factors, the White House constituted a part of the business premises of the employer, though not physically contiguous to headquarters. In this case plaintiff, although he had an office at the employer's headquarters, worked in his residence in the evenings and on weekends, had business meetings and performed required business telephone calls from there which could not be made during normal business hours, and conducted regular business entertaining in the residence. In this sense plaintiff's residence was a part of the business premises of his employer, for it was a "premises on which the duties of the employee are to be performed", *United States Junior Chamber of Commerce v. United States,* 334 F.2d at 664–65, 167 Ct.Cl. at 400, and a "premises on which the company carries on some of its business activities." *Gordon S. Dole,* 43 T.C. at 707.

■ Interpretations of the phrase which are limited to the geographic contiguity of the premises or to questions of the quantum of business activities on the premises are too restrictive. *But see Comm'r. of Internal Revenue v. Anderson,* 371 F.2d 59 (6th Cir. 1966). Rather, the statutory language "on the business premises of the employer" infers a functional rather than a spatial unity. In Rev.Rul. 75–540, 1975–2 Cum. Bull. 53, it was determined that the fair rental value of the official residence furnished a governor by the state is excludable from the governor's gross income under Section 119 of the Code. The Ruling noted that the business premises test was met because the residence provided by the state enabled the governor to carry out efficiently the administrative, ceremonial, and social duties required by his office. The governor's mansion, thus, served an important business function in that it was clearly identified with the business interests of the state. It was, in short, an inseparable adjunct. Similarly, in *United States Junior Chamber of Commerce, supra,* one of the main objectives of the employer was to promote and foster the growth of civic organizations in the United States. The White House, as official residence of the president of the organization, served a significant public relations function in furtherance of the organization's goals. In the present case, even apart from the strictly business activities which took place in plaintiff's residence, the house was a symbol to the Japanese business community of the status of Sekiyu's chief executive officer and a place where he officially entertained for business purposes. As such, it influenced plaintiff's effectiveness in the business community and directly served a business function for Sekiyu.

The situation, thus, is not the same as in *James H. McDonald,* 66 T.C. 223 (1976). In that case, the court found the quantum of business activities performed by the taxpayer in his home to be insignificant. There was no suggestion of prestige value to the employer or of its use for significant business entertainment. Also, the court held that the rental apartment supplied to the taxpayer was not closely identified with the business interests of his employer. Here, because plaintiff was the highest-ranking officer of his company, his status in the

business community was extremely important to his employer. The residence supplied to him was closely identified with Sekiyu's business interests and was used to advance those interests.

We take cognizance of the admonition of Judge Raum to avoid "strained or eccentric" interpretations of the phrase "on the business premises." *Gordon S. Dole*, 43 T.C. at 708 (Raum, J., concurring), *aff'd per curiam*, 351 F.2d 308 (1st Cir. 1965). However, we are persuaded that where, as here, (1) the residence was built and owned by the employer, (2) it was designed, in part, to accommodate the business activities of the employer, (3) the employee was required to live in the residence, (4) there were many business activities for the employee to perform after normal working hours in his home because of the extensive nature of the employer's business and the high-ranking status of the employee, (5) the employee did perform business activities in the residence,[2] and (6) the residence served an important business function of the employer, then the residence in question is a part of the business premises of the employer.

The three statutory requisites for exclusion are met. Accordingly, pursuant to Section 119 of the 1954 Code, the fair rental value of the residence is excludable from plaintiff's gross income. Plaintiffs are entitled to recover, and the amount will be determined under Rule 131(c).

2. In addition to the consistent use of the den for work purposes, and the official phone calls, plaintiff used the house for gatherings of his staff with mixed business and social purposes and also for more extended business entertainment.