**BOB JONES UNIVERSITY**

v.

**The UNITED STATES.**

No. 553–78.

United States Court of Claims.

Jan. 27, 1982.

---

George D. Webster, Washington, D. C., for plaintiff. Alan P. Dye, Washington, D.

C., attorney of record. Steven D. Simpson and Webster & Chamberlain, Washington, D. C., of counsel.

Kevin B. Shea, with whom was Acting Asst. Atty. Gen. John F. Murray, Washington, D. C., for defendant. Theodore D. Peyser and Robert S. Watkins, Washington, D. C., of counsel.

Before DAVIS, NICHOLS and KUNZIG, Judges.

## OPINION

PER CURIAM:

This withholding tax case concerns the excludability of the fair market value of meals and lodging furnished by plaintiff Bob Jones University to many members of its faculty and staff. Trial Judge Bernhardt, after a trial, held for the Government. The case comes before us on the University's exceptions to the trial judge's opinion, findings, and result. Defendant supports the trial judge. Oral argument has been had and the court has also considered the written submissions and the record.

■ We adopt the trial judge's opinion and findings, with slight modifications and a substantive change as to certain employees whose activities seem to us to warrant a lodging exclusion. As so modified and altered, that opinion is set forth hereafter and forms part of the court's opinion. In addition, we supplement the trial judge's opinion with the following paragraphs of this *per curiam* opinion. Our judgment rests on the trial judge's opinion (as modified) and findings (as modified)[1] plus our supplementary discussion.

1. The heaviest emphasis is put by the University on its primary character as a religious organization, and in that connection the significant part it has expected its faculty and staff to play as role models (for the students) of proper Christian living—throughout the day. It is said that the trial judge failed to take account of these important factors. On the contrary, we think that the trial judge fully considered them. The difficulty is that it is not plaintiff's own *subjective* aim that is determinative. As the trial judge points out, the proper standard is *objective.* "The employer's state of mind is not controlling." *Dole v. Commissioner,* 43 T.C. 697, 706, aff'd, 351 F.2d 308 (1st Cir. 1965). The trial judge applied that objective standard, as do we.

Objective evaluation shows that it cannot be said that, under the University's plan, the faculty and staff members would act—in any substantial way—as such role models while eating meals in plaintiff's dining room or while at home in plaintiff's housing. The paucity of contacts between them and the students at those times (as well as the lack of substantial opportunity for the students to observe the members at home and while eating) was much too great. In addition, the faculty and staff who lived in their own homes and ate elsewhere had the same role-model relationship to the students, thus indicating that University lodging and meals were unnecessary or unimportant for maintenance of the position of role model.

We recapitulate the facts: With respect to the lodging:[2] (1) although there was full access by students to faculty (and staff) in classrooms and offices during the working day, faculty and staff housing on the campus was off-limits to students after 6:00 p. m. without permission; students were prohibited from calling faculty members at home regarding classwork unless the faculty member had requested the student to do so; students seeking assistance at the

---

1. Our separate order of this date adopts the trial judge's findings (with specified changes). We do not print the findings because this opinion gives the facts necessary for an understanding of our decision. Any facts stated in this opinion, but not contained in the formal findings, are to be considered additional findings of fact.

2. On the basis of the post-argument submissions we conclude that 449 out of 633 faculty and staff members received lodging; of the 449, 216 were faculty members (out of a total of 316 faculty members) and 233 were staff members (out of a total of 317 staff members).

homes (including the off-campus University-owned Campus View Apartments) for personal and spiritual problems had to call in advance of visiting the homes; visits to the off-campus Campus View Apartments were comparably restricted and required permission;

(2) under the parent program the faculty and staff invited students to their homes relatively infrequently—on the average, from once a month to two or three times a semester—and members (faculty and staff) who did not live in University housing had the very same obligations;

(3) chaperoning activities did not take place at the home, were likewise imposed on those who did not live in plaintiff's housing, and do not seem to have been frequent for each particular member; and

(4) the outside-of-class-hours contacts between the students and those members living in University housing do not appear to have been appreciably greater than the outside-of-class-hours contacts between the students and the members who lived in their own homes.

The sum of it is that the contacts between students and faculty and staff members who lived in University houses, while the latter were at home or during off-hours, seem minor and not measurably greater than the contacts between the students and the members who lived in their own homes.[3]

With respect to *meals:* (1) faculty and staff members ate in a separate dining room with a separate entrance, and did not mingle at all with students at or while waiting for meals; and (2) the only contact with students, in connection with on-campus meals, was perfunctory communication on the way to or from the dining room. There was thus very small opportunity for the members to be (or to be observed as) role models at meal-time.[4]

2. The University seems to urge that its own view of the religious importance of the lodging and meals must necessarily be preferred to that of the members of the faculty and staff who testified that their functions were not diminished by their living in their own homes or eating elsewhere. The prime answer is that, as we have just said, the hard facts (rather than anyone's opinion) demonstrate that the plaintiff's view does not have objective reality, and accordingly it cannot be considered an objectively reasonable position that the role-model factor was substantially enhanced by the furnishing of lodging and meals. In any event, we think that the member testimony credited by the trial judge referred to the members' religious (as well as educational) function—and we see no reason to discount that evidence given by persons who held the same religious views as plaintiff and were well aware of the University's orientation and goals.

■ 3. Our application of § 119 does not trench on the free exercise clause of the First Amendment. Plaintiff's only claim is that the lodging and feeding of its faculty and staff were necessary so that they would and could be role models to the students, "visible to the students as Christian believers" (Plaintiff's brief, p. 4). The facts show that the University's own practices made it difficult and unlikely for this religious belief (as it related to lodging and housing) to be fulfilled in any substantial manner, or any more than if the lodging and meals had not been provided. It is not the Government that is burdening or forbidding plaintiff's religious beliefs. There is no governmental prohibition or restriction on the supplying of lodging and meals, nor is the Government forbidding or restricting greater contact between students and members at their homes or during meals. There is,

---

**3.** There is an exception for Luena Barker and like dormitory counsellors. We have modified the trial judge's opinion with respect to that small group in order to recognize that their lodging falls under § 119.

**4.** In the light of the evidence, plaintiff's contention that it always kept its housing and dining

room filled is not conclusive. The record shows that permission to live and eat outside was usually given if sought. The proportion of the members who lived and ate outside was large, though not the majority (at least as to lodging). *See* note 2, *supra*.

moreover, no showing that the imposition of income tax on the fair market value of the lodging and meals interferes with the members' acting as role models any more than does the imposition of the income tax on the members' other compensation which of course covers their religious functions too.

On the basis of the foregoing discussion and the modified trial judge's opinion (which together constitute the court's opinion) as well as the findings, the court holds that plaintiff is not entitled to recover (except for Luena Barker and like dormitory counsellors) and defendant is entitled to recover on its counterclaim.[5]

## OPINION OF TRIAL JUDGE

BERNHARDT, Trial Judge: The issue in this tax refund case is whether the fair market value of meals and lodging furnished by plaintiff, Bob Jones University (University), to its faculty and staff members is excludable from gross income under section 119 of the Internal Revenue Code of 1954. Defendant, for the most part, prevails.

On August 29, 1977, the Internal Revenue Service (IRS) informed plaintiff that it was revoking its earlier ruling[1] that sustained the exclusion of the value of the plaintiff's employer-provided meals and lodging from the gross income of taxpayer's employees beginning October 1, 1978. Plaintiff then made a deposit of $514.91 representing the withholding taxes on the value of meals and lodging furnished by plaintiff to six employees during January and February of 1978.[2] Plaintiff filed a claim for refund of $514.91 on June 15, 1978, and, upon denial,

filed the instant suit on December 20, 1978. On April 30, 1979, defendant filed a counterclaim in the amount of $42,213.51 for additional withholding tax covering the entire faculty and staff for the first quarter of 1978. By stipulation this figure was later reduced to $28,100.01.

Plaintiff is a unique fusion of an educational and religious institution. It postulates that by minimizing contact between its students and the secular world, maximizing the close fraternity of faculty, staff and students by physically centralizing their lodging, meals and school activities so as to project an image of a large, indwelling, intensely Christian family, and providing a full course college education with heavy emphasis on fundamentalist Christian doctrines, it can channel its youthful students' zeal and mayhap their careers into the propagation of a strictly literal gospel.

In order to accomplish its goal plaintiff has instituted a variety of practices, benefits and programs to attract and hold its modestly paid and religiously motivated faculty and staff, including free housing, free meals, medical care, insurance, low-cost loans, inexpensive automobile fuel, a "campus parent program", chaperoning of students, and tight control over their extracurricular life, among others. Plaintiff believes that, in order best to train its young people to become educated citizens in a Christian mold, it must create an exclusive Christian enclave in which the students are taught and supervised by a carefully selected faculty and staff of fundamentalist who can serve as role models for their charges.

---

**5.** The court's conclusion of law is set forth following the trial judge's opinion, *infra.*

**1.** The earlier ruling was not supplied for the record, so we cannot speculate as to its justification.

**2.** Although plaintiff's requested relief concerned only six employees, plaintiff used these employees, along with 27 others whose deposition testimony is part of the record, as representative of all its employees for the purpose of proving the general applicability of section 119 of the Internal Revenue Code of 1954 to all the faculty and staff. While some faculty and staff members were required to spend more time discharging their responsibilities than others because of the nature of their jobs and/or their own degree of dedication, since plaintiff has requested a determination of section 119's applicability to all its faculty and staff, and since no evidence was presented with respect to the granting of individual relief (except with respect to dormitory counsellors), application of section 119 to the six employees listed in plaintiff's petition on an individual basis is not decided.

This educational and religious oasis, founded in 1927, has since 1947 occupied a 200-acre campus in the environs of Greenville, South Carolina. The campus is surrounded by a 6-foot high wire fence, ingress and egress through which at a main gate is controlled by guards as a security measure.

There is both on-campus and immediately off-campus housing for faculty, staff and students. The former consists of houses, apartments and student dormitories inside the security fence girdling the campus. The off-campus housing comprises the Campus View apartments and a number of small houses acquired by the University directly across a public highway from the campus close, and no further than three blocks from it. Although the University would prefer to house all faculty, staff and students within the campus proper, growth of the student body over the years and the inability to acquire adjoining land to expand the campus forced the plaintiff to burgeon to the immediately adjacent area. As a supplement to their substandard wages, all housing is provided free-of-charge to faculty and staff, including maintenance, utilities, heating, etc.

Of the 715 faculty and staff members on plaintiff's payroll (including 79 graduate students who do not figure in this proceeding), at relevant times about 440 lived in University-provided housing, approximately 188 of them on-campus and 251 off-campus.[3] Normally the University required faculty and staff to live in free University-owned housing if it was available and suitable, but there were many exceptions. Thus 194 faculty and staff members were permitted to live off-campus in their own homes, either because of lack of adequate University-owned housing, ineligibility for University-owned housing where only one spouse was a University employee, or the economic or tax benefit accruing to the individual by personal home ownership. Employees permitted to live in off-campus housing not owned by the University re-ceived a monthly salary supplement in lieu of lodging of $110 if single and $310 if married.

Free meals were provided by the University during the relevant time period to 551 of the 636 faculty and staff members who were not graduate students. The meals were served in an on-campus dining room adjoining a larger dining common used by the students. In both dining rooms the breakfast and lunch meals were cafeteria style, and the evening meal was served at table. Because of insufficient space to accommodate all faculty and staff members, many were given the option to have their evening meal elsewhere and receive in lieu the monthly sum of $25 per person. In addition many faculty and staff members elected, without compensation, to have their breakfast and/or lunch at their nearby homes or elsewhere. An important purpose of community dining was to further the family image. Even though faculty and students did not mingle at meals there was an intangible togetherness, and the trip to and fro afforded opportunities for informal exchanges among them in contrast to the impersonal gulf existing between faculty and student body in a typical college environment, of which we may take nostalgic judicial cognizance.

The University sponsors a "campus parent program." Each adult member of a faculty or staff family is assigned responsibility for counseling and providing home hospitality for two incoming students in order to provide a surrogate family relationship for students far from home. The flavor of family was to permeate academe. Since plaintiff hires only persons of a fundamentalist Christian persuasion for its faculty and staff, they are intended to serve as Christian family prototypes or role models to their "campus children", as they are paternalistically called. In addition to their educational and administrative duties, and in order to insure that students comply with the University's strict rules governing their

---

3. Due to slight inconsistencies in the record, the breakdown of the faculty and staff receiving lodging and meals from plaintiff are close approximations and thus, when added together, do not equal the total of 715.

social, religious and educational mores, the faculty and staff members have rotating duties to chaperone students during church services, athletic events, plays and concerts, and on dates. They are also required to enforce the University's strict disciplinary rules whenever they observe infractions by errant students. With limited exceptions faculty and staff members living in University-owned housing are required to attend on-campus church services every Sunday and vespers on alternative Sundays, in addition to chapel services four times weekly, and a faculty meeting each week. They are expected to attend all school functions such as athletic events, operas, plays, and concerts.

The extracurricular duties of the faculty and staff as outlined above may not be as omnipresent as they may seem. For example, although faculty and students are encouraged to have informal contacts (*i.e.*, campus parent program and chaperoning), the University does not permit students to discuss their educational problems with the faculty on the telephone, prohibits students from leaving the campus in the evening (with some exceptions) so that off-campus visits to faculty members are not frequent, and on-campus meals are not integrated. The faculty and staff are not on duty around the clock; they are free to absent themselves outside the working day; most of them perform *de minimis* services for the University at home; chaperoning duties occurred as infrequently as twice a year; and most "campus parents" had their assigned "campus children" to their homes on an average of only once a month or two or three times a semester. Some individuals devoted much more off-duty time than others with the students, and some spent none at all.

There is no doubt as to the genuineness of plaintiff's goals and the sincerity of its belief in the purposes and efficacy of the means taken to accomplish them. The faculty and staff members consider their services a form of ministry. Salaries, which are far less than prevailing standards for comparable service, are only of secondary importance to them. They rely on the good-will of the University to supplement salaries with such additions as free lodging, meals, medical care, insurance, gasoline at cost, and low interest loans, so they can make ends meet. It would be difficult to conjure the counterpart of the University elsewhere in the educational/religious spectrum.

Plaintiff contends that its practice of providing free meals and lodging to its faculty and staff in order to project an insulated Christian community and to promote informal contacts between them and the students meets the requirements of I.R.C. section 119, thus making the meals and lodging excludable from plaintiff's gross income. However, the record faults the contention.

Gross income encompasses all income whatever the source, including but not limited to compensation for services. I.R.C. § 61(a) (1954). Treas.Reg. 1.61–2(d)(3) (1958) states:

> Meals and living quarters. The value of living quarters or meals which an employee receives in addition to his salary constitutes gross income unless they are furnished for the convenience of the employer and meet the conditions specified in section 119 and the regulations thereunder. * * *

Consequently the fair market value of the meals and lodging furnished by plaintiff is includable in the gross income of its employees unless specifically excluded under section 119. *Commissioner v. Duberstein*, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960); *Commissioner v. LoBue*, 351 U.S. 243, 76 S.Ct. 800, 100 L.Ed. 1142 (1956).

Section 119 of the 1954 Code provides in pertinent part as follows:

> There shall be excluded from gross income of an employee the value of any meals or lodging furnished to him, his spouse, or any of his dependents by or on behalf of his employer for the convenience of the employer, but only if—
>
> (1) in the case of meals, the meals are furnished on the business premises of the employer, or

(2) in the case of lodging, the employee is required to accept such lodging on the business premises of his employer as a condition of his employment.

Therefore, in order for employer-provided meals to qualify for the section 119 exclusion, the meals must be furnished on the employer's business premises and for the convenience of the employer. Treas.Reg. § 1.119–1(a)(1) (1964). In order for the employer-provided lodging to qualify for the section 119 exclusion it must meet the tests stated above for meals and, in addition, the further requirement that the employee accept the lodging as a condition of his employment. Treas.Reg. § 1.119–1(b) (1964). The failure of a taxpayer to establish any one of these criteria suffices to preclude application of section 119. *Dole v. Commissioner*, 43 T.C. 697, aff'd, per curiam on Judge Raum's concurring opinion, 351 F.2d 308 (1st Cir. 1965); *Olkjer v. Commissioner*, 32 T.C. 464 (1959).

Two canons of tax law are guides in determining whether plaintiff has qualified for the exclusion from gross income under section 119. First, "provisions within tax legislation granting exemptions be strictly construed in accordance with their terms." *Commissioner v. Anderson*, 371 F.2d 59, 63 (6th Cir. 1966), cert. denied, 387 U.S. 906, 87 S.Ct. 1687, 18 L.Ed.2d 623 (1967). Second, "tax assessments made by the Commissioner of Internal Revenue are presumptively correct and must stand until controverted by a preponderance of the evidence produced by the taxpayer." *United States v. Donovan*, 309 F.Supp. 152, 153 (E.D.Va.1969). "[T]he burden of proof is on the taxpayer to show that the commissioner's determination is invalid." *Helvering v. Taylor*, 293 U.S. 507, 515, 55 S.Ct. 287, 291, 79 L.Ed. 623 (1935).

■ The value of plaintiff's lodging, whether on-campus or off-campus, is not excludable from the gross income of its faculty and staff members because they were not required to accept the lodging as a condition of their employment. Section 1.119–1(b) of Treasury Regulations states that an employee is required to accept lodging as a condition of his employment if he is required to accept it "in order to enable him properly to perform the duties of his employment." In order to meet this test it is not necessary for the plaintiff to show that were it not for employer-provided lodging its faculty and staff could not possibly carry out their duties. *Caratan v. Commissioner*, 442 F.2d 606, 609 (9th Cir. 1971). However, plaintiff must prove that its free lodging is integrally related to the duties of the faculty and staff. *McDonald v. Commissioner*, 66 T.C. 223, 232 (1976). "[I]f the duties the employee is employed to perform do not require his occupancy of the lodging furnished by the employer, but the employer appears to have lodging available and it seems more desirable that the employee occupy the premises, we do not think the value of the lodging is excludable from gross income under section 119." *Heyward v. Commissioner*, 36 T.C. 739, 744, aff'd. per curiam, 301 F.2d 307 (4th Cir. 1962).

The determination of whether an employee is required to accept lodging as a condition of his employment involves an objective examination of the facts surrounding the furnishing of such lodging. "The standard prescribed by Congress is not subjective. It is objective. The employer's state of mind is not controlling." *Dole v. Commissioner, supra*, 43 T.C. at 706. Objective examination of the present facts persuades that the faculty and staff were not required to accept plaintiff's lodging to perform their duties properly.

Irrespective of where they lived faculty and staff members were required to undertake closely comparable extracurricular responsibilities while employed by plaintiff and were able to execute them satisfactorily. For example, under University policy all faculty and staff members, in addition to their teaching and administrative responsibilities, were required to attend church services every Sunday, vespers on alternate Sundays, and chapel 4 days a week. All were assigned chaperoning duties and entertained and counseled their campus children in their homes an average of once a

month to two or three times a semester. The faculty and staff also took an active interest in the students, enforced plaintiff's disciplinary rules, and attended University athletic, social and fine arts programs. These obligations did not depend upon or vary with residential locations.

The absence of the faculty and staff on campus outside of school hours did not adversely effect their community of interests with the students. Students were still able to meet them formally and informally on campus during the day and, with permission, could visit them in their homes whether on- or off-campus. Thus the "role model" function of faculty and staff vis-a-vis the student body, that is, their image as Christian family prototypes or surrogate parents, was not measurably affected by their being housed just beyond rather than within the campus pale.

Section 1.119–1(b) of the Treasury Regulations provides:

> Lodging will be regarded as furnished to enable the employee properly to perform the duties of his employment when, for example, the lodging is furnished because the employee is required to be available for duty at all times * * *.

Plaintiff's faculty and staff were not called, except possibly on rare occasions, at their homes nor had their meals interrupted to answer emergency calls. With rare exception the faculty and staff worked from 8:00 a. m. to 5:00 p. m., or taught and held office hours during specific hours, after which they performed little or no services for plaintiff. Their weekends and holidays were free except for infrequent chaperoning assignments and attendance at church services from which they could be excused.

Other factors reenforce the conclusion that the faculty and staff were not required to accept plaintiff's lodging as a condition of their employment. Lodging was provided on working as well as non-working days when the faculty and staff were not required to be on campus. *De minimis* services were performed for plaintiff at home, such as the occasional entertaining of students and campus children, and the grading of papers.

The lodging aspect is analogous to that in *Dole v. Commissioner, supra,* where plaintiffs were provided lodging in company-owned houses within one mile of the employer's mill. There, despite the fact that the employees were required to work between 10 to 12 hours a day, and on weekends, and were often called back to work in the evenings for emergencies, the exclusion under section 119 was nonetheless denied. It was held that, since none of the employer's work was performed in the employees' home, the employer provided the lodging because it preferred its employees to live near or on the worksite so that they would be more readily available for work, and not because it was prerequisite to the performance of their duties. Here, the ability of the faculty and staff to discharge their duties irrespective of where they resided, coupled with *de minimis* employer-related activity carried on in the homes, evidences plaintiff's purpose to be to provide lodging so its faculty and staff could be closer to the campus, and not because proximity was a *sine qua non* to performance of their duties. This is not to decry plaintiff's sincerity in feeling that its fundamental educational, religious and character-molding purposes would be best accomplished if the faculty and staff lived, worked, studied and worshiped in as familial proximity to the students as circumstances permitted.

Other cases urged by plaintiff are distinguishable. In *Caratan v. Commissioner, supra, Hatt v. Commissioner,* 28 T.C.M. (CCH) 1194, *aff'd. per curiam,* 457 F.2d 499 (7th Cir. 1972); *Diamond v. Sturr,* 221 F.2d 264 (2d Cir. 1955), the employees furnished housing were required to be on duty 24 hours a day, unlike the pattern here. In *Olkjer v. Commissioner, supra,* the employer-provided housing was furnished at a construction site in Greenland where no other housing was available. The faculty and staff at the University were not faced with the absence of alternative housing, as shown by the purchase of nearby residences by both the University and some 194 faculty and staff members.

■ Turning now to the "convenience of the employer" test, this court held in *United States Junior Chamber of Commerce v. United States*, 167 Ct.Cl. 392, 397, 334 F.2d 660, 663 (1964), that "[t]here does not appear to be any substantial difference between the * * * 'convenience of the employer' test and the 'required as a condition of his employment' test." Accordingly our conclusion that the present plaintiff has failed to meet the "condition of employment" test subsumes without more a failure to meet the "convenience of the employer" test.

■ Lest doubt lingers there is a more compelling reason for finding that the lodging was not provided for the convenience of the employer. In *Adams v. United States*, 218 Ct.Cl. 322, 329, 585 F.2d 1060, 1064 (1978), the court citing *McDonald v. Commissioner, supra*, 66 T.C. at 230, stated that "the convenience of the employer test is satisfied where there is a direct nexus between the housing furnished the employee and the business interests of the employer served thereby." That the employee also gained a benefit from the lodging does not vary the tax consequence. *Olkjer v. Commissioner, supra*, 32 T.C. at 469. Plaintiff contends that its business interest fostered through the furnishing of lodging is the creation of a Christian community free of secular diversions in which frequent informal contacts occur between the faculty and staff and the students.

As with the "condition of employment" test, plaintiff's failure to meet the "convenience of the employer" test is anchored in the tangential role plaintiff's lodging played in the accomplishment of its religious and educational goals. This tangential role is suggested by the fact that plaintiff furnished lodging for the purpose of compensating its faculty and staff. While religious and educational goals may have been collaterally served to some minor extent, plaintiff's prime reason for free lodging was to ameliorate the disparity between prevailing wage scales and the salaries paid faculty and staff by plaintiff, averaging one-third to one-half the salaries at comparable institutions. Plaintiff's compensatory purpose is further accentuated by the fact that free lodging is but one element of an employee's free benefits package which includes, *inter alia*, meals, life and health insurance, education for single dependents of the faculty and staff to the bachelors degree level, and low interest loans. The benefits package enabled the dedicated faculty and staff to remain employed by the University despite low salaries. Thus, although the convenience to the plaintiff in compensating the faculty and staff in ways other than through salary may have dictated the furnishing of lodging, the indirect nexus of free lodging to plaintiff's educational and religious goals did not require plaintiff to subsidize it. Plaintiff could achieve its objectives without the tax benefit provided under section 119.

■ Plaintiff's off-campus housing, Campus View apartments and the nearby houses, also might not qualify technically for the section 119 exclusion because they are not on the business premises of the employer. The phrase "on the business premises" has undergone much judicial scrutiny and analysis and "is at best elusive and admittedly incapable of generating any hard and fast line", *Lindeman v. Commissioner*, 60 T.C. 609, 617 (1973) (Tannenwald, J., concurring). As noted in *Adams v. United States, supra*, 585 F.2d at 1065, the application of this test "is largely a factual one requiring a commonsense approach." The phrase has been construed as meaning (1) living quarters that constitute an integral part of the business property, and (2) premises on which the employer carries on some substantial segment of its business activities. *Adams v. United States, supra*, 218 Ct.Cl. at 332, 585 F.2d at 1066; *see Dole v. Commissioner, supra*, 43 T.C. at 707; *Lindeman v. Commissioner, supra*, 60 T.C. at 615; *Commissioner v. Anderson, supra*, 371 F.2d at 66. Recently, in *Adams v. United States, supra*, 218 Ct.Cl. at 332, 585 F.2d at 1066, this court held that functional rather than spatial unity is determinative of whether lodging is on the employer's business premises.

Plaintiff's off-campus housing fails to meet these criteria. First, the off-campus lodging is not geographically integrated with the University as was the lodging in *Lindeman.* There the hotel manager's employer-provided lodging was separated from the hotel by a street and was situated where plaintiff could observe a portion of the building for problems which might arise. The manager also had a direct hotel telephone line to his house where guests could reach him in case of an emergency. Unlike *Lindeman,* plaintiff's off-campus housing is located from across the intervening highway to three blocks away from the main campus, thus preventing many of the faculty and staff from seeing all or most of the campus. This is of some relevance because plaintiff alleges that the close proximity of the off-campus housing to the University permits the students to observe the faculty and staff as role models of Christian families. Also, unlike *Lindeman,* plaintiff's off-campus homes are separated from the main campus by a 6-lane highway which many of the faculty and staff consider dangerous to cross except by vehicle, and are not connected to the University telephone exchange system.

Plaintiff's own rules also inferentially recognize the off-campus housing to be separate from the University despite plaintiff's contention to the contrary. For example, all students except male juniors and seniors must obtain permission to leave the campus at night to visit a faculty member, and are picked up by the faculty or staff member at the main gate. Plaintiff's practice of locking its gates in the evening to vehicular and pedestrian traffic also suggests that plaintiff views its off-campus housing as not an integral part of the University.

Second, no substantial portion of plaintiff's activities is conducted in the off-campus housing. The University does not require the faculty to perform services for it in their homes, and generally the faculty does not carry out educational responsibilities in them aside from the occasional grading of papers or preparation for class. From a religious aspect the faculty and staff, though assigned campus children, host them at home on an average of only once a month to two or three times a semester. When viewed in light of the fact that the faculty and staff conduct no other school business in their homes, this activity alone is insufficient as a matter of law to elevate the off-campus housing to the status of being "on the business premises" functionally for the purposes of section 119. In *Goldsboro Christian Schools, Inc. v. United States,* 436 F.Supp. 1314 (E.D.N.C.1977), employer-provided housing located off of the school premises was considered not on the business premises when the only activity performed by the faculty in the housing was occasional grading of papers and meetings with students' parents.[4]

Finally, plaintiff's free lodging for faculty and staff cannot be said to be functionally related to its educational and religious goals. The fact that all the faculty and staff had the same responsibilities and satisfactorily executed them irrespective of whether they lived in their own homes or University housing, and whether on- or off-campus, logically indicates that the location of the housing bore no special functional relationship to their employment by plaintiff.

Plaintiff contends that its case is analogous to *Adams v. United States, supra,* in that just as the Japanese business community attached prestige value to the employer-owned house in which Adams resided because of his position with Mobil Oil Company, so the University attaches importance to the community image created by having housing located on or in close proximity to the main campus. The intangible benefit derived by the University in creating a Christian community, while real and genuine in the plaintiff's purposes, is not of itself sufficient to establish a functional

---

4. Although in *Goldsboro Christian Schools, Inc. v. United States,* 436 F.Supp. 1314 (E.D.N.C. 1977), the students lived with their parents and not at the school as the students in this case do, this factual distinction is not determinative for purposes of determining whether plaintiff conducted some substantial segment of its work in the off-campus housing.

relationship to the accomplishment of plaintiff's educational and religious goals, absent a showing that more than token duties for plaintiff were performed by the faculty and staff in their University provided lodging.[5]

We have observed earlier that the two tests under I.R.C. section 119, for the exclusion from gross income of the value of meals furnished by an employer are that they be furnished on the employer's business premises, and that they be furnished for the employer's convenience. Without question the plaintiff furnished its meals to the faculty and staff on University premises. However, under the applicable Treas. Reg. 1.119–1(a)(2)(i) they would not be considered to be provided for the employer's convenience. That regulation provides as follows:

> Meals furnished by an employer without charge to the employee will be regarded as furnished for the convenience of the employer if such meals are furnished for a substantial noncompensatory business reason of the employer. If an employer furnishes meals as a means of providing additional compensation to his employee (and not for a substantial noncompensatory business reason of the employer), the meals so furnished will not be regarded as furnished for the convenience of the employer. * * * Generally, meals furnished before or after the working hours of an employee will not be regarded as furnished for the convenience of the employer * * *.

In the first place plaintiff's breakfast and evening meals do not qualify for the exclusion under section 119 because they were provided before and after the working hours of the faculty and staff. Also, meals provided on weekends are outside of section 119 as well because they were furnished on non-working days.

The evening meal fails to qualify for the section 119 exclusion for the additional reason that faculty and staff members are afforded the option to receive compensation in lieu, an option which Treas.Reg. 1.119–1(c)(2) specifically precludes the exclusion from gross income in the following terms:

> The exclusion provided by section 119 applies only to meals and lodging furnished in kind by an employer to his employee. If the employee has an option to receive additional compensation in lieu of meals or lodging in kind, the value of such meals and lodging is not excluded from gross income. * * *

To show that it furnished meals for its own convenience plaintiff must prove that they were provided for a substantial noncompensatory business reason. Treas.Reg. 1.119–1(a)(2)(i) provides:

> In determining the reason of an employer for furnishing meals, the mere declaration that meals are furnished for a noncompensatory business reason is not sufficient to prove that meals are furnished for the convenience of the employer, but such determination will be based upon an examination of all the surrounding facts and circumstances. * * *

Examples of situations in which meals are offered for substantial noncompensatory business reasons under the regulations are where the employee (1) is required to be available for emergency calls during his meal period, (2) is restricted to a short meal period of 30 to 45 minutes, and (3) is unable to otherwise secure proper meals within a reasonable meal period. Treas.Reg. 1.119–1(a)(2)(ii)(a–c).

Plaintiff fails to meet this regulatory criterion. The faculty and staff were not on call during their meals. Although some faculty and staff believed to the contrary, few recollected actually being summoned from a meal to handle an emergency. They were under no time constraints for their meals, whether on- or off-campus. Plaintiff's principal compensatory purpose in

---

**5.** Our holding that § 119 fails to cover University-provided lodging is inapplicable to Luena Barker and like dormitory counsellors. The record shows that Miss Barker was a counsellor and resided in a girl's dormitory, was required to be on duty 24 hours a day, and could not have at all performed her duties as dormitory counsellor if she had not resided on campus.

providing the meals was as part of a benefit package offered to the employees to compensate them for their relatively low salaries.

Plaintiff furthermore maintains that community dining encouraged by free meals promotes informal communications among faculty, staff and students. Circumstances negate this contention. Faculty and staff dine in a separate room adjoining the students' dining room and use separate entrances. Mingling is minimized. Informal contact to and from meals adds little of substance to fraternization. Contacts are brief and consist mainly of salutations and pleasantries. These factors, coupled with the fact that two-thirds of the faculty and staff partake the evening meal away from the dining common, and often skip the breakfast and lunch meals, persuades the net conclusion that the compensatory purpose of free meals transcends the community purpose.

For the foregoing reasons the value of the lodging (except for Luena Barker and like dormitory counsellors) and meals given to plaintiff's faculty and staff fails to qualify for the exclusion benefit of section 119 of the 1954 Code. The petition will be dismissed (except with respect to the lodging of Luena Barker and like dormitory counsellors) after determination in the Trial Division (or by stipulation) of the amount to be entered on defendant's counterclaim.

## CONCLUSION OF LAW

Upon the findings of fact and the opinion, the court concludes as a matter of law that plaintiff is not entitled to recover except with respect to the lodging provided to Luena Barker and like dormitory counsellors. With that exception plaintiff's faculty and staff are not entitled to exclude the fair market value of the University-provided meals and lodging from their gross income. Conversely, defendant is entitled to recover on its counterclaim with the same exception. The amount of defendant's recovery will be determined under Rule 131(c). Thereafter the petition will be *pro tanto* dismissed.

NICHOLS, Judge, concurring and dissenting:

I concur in the result in part and dissent in part. I agree with the court that the first amendment does not endow Bob Jones University with exemption from the obligations under the Internal Revenue laws that would fall upon a wholly secular employer otherwise similar. I also agree that common fairness compels the court to disregard the all-or-nothing approach of plaintiff and consider separately the separate category of "dormitory counsellor" such as Luena Barker, whose on-campus residence is shown to be indispensable for performance of her onerous duties. I believe, however, that there may be other categories of faculty members whose interests may also wrongly go down the drain if ignored by the court. Though not parties, they have a stake in this litigation that cannot be ignored. I would not dismiss the petition as to them, but would require further fact findings focused on the function and responsibilities of specific categories. I agree the petition should be dismissed as to all nonfaculty members and (as to lodging) all persons residing off-campus, even if in University-owned housing.

Plaintiff got its case off on the wrong foot by stating its contention to be that its employees were "role models." This is a handy phrase, though somewhat absurd as to the maintenance and landscape engineer. The findings show it falls far short of the real demands of the institution upon its faculty members. The phrase invites the court's too ready response of asking how a person could be a "role model" for a student when not under the student's direct observation. The trial judge's findings describing this unique institution show there is far more to the issue than that. It is a matter of faculty members surrendering personal freedom, night and day, to collaborate in developing a "we and they" polarization between the University and the rest of the world. The separation is made concrete, and also symbolized by the massive wall with its ever guarded gates. It is true the University relies on faculty volunteers to

enjoy the blessings of its bed and board, but who can doubt the testimony that compulsion would be resorted to if the supply of volunteers were insufficient to keep the housing and refectory fully employed?

This is an attempted revival of the ancient role of the university in society and to create again the mutual animosity of "town and gown" that characterized the great universities of the middle ages. Most of those in our time have lost whatever capacity they ever had to stamp their people with their own peculiar brand. The old chestnut: "you can always tell a Harvard man but you can't tell him much" is no longer true as to either part. The actual Harvard man (or woman) of today has less in common with other Harvard persons than with non-Harvards of his or her race, occupation, social situation, or even geographical distribution. The only ones who graduate with a Harvard accent are those who matriculated with one. To counter this trend is an uphill struggle in today's world, but it is one from which the founder, Bob Jones, and his descendants, do not falter or flinch. It is one from which the faculty are not excused or on leave when, for the moment, they are out of the students' observation, whether eating or in the privacy of their quarters. I am not at all persuaded that other faculty members besides dormitory counsellors, who reside and eat on campus, are not there for the employer's "convenience," in the statutory phrase, even when they are asleep.

The IRS in its drive to recover taxes on every scintilla of benefit enjoyed by employees from employers by way of meals and lodging, has indulged in a good many excesses. I am not at all persuaded this case is not one of them.