The INCORPORATED TRUSTEES OF
the GOSPEL WORKER
SOCIETY, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 344–83T.

United States Claims Court.

Sept. 13, 1984.

Scott P. Crampton, Washington, D.C., attorney of record for plaintiff. Macdonald, McInerny, Guandolo, Jordan & Crampton, Washington, D.C., of counsel.

Kevin B. Shea, Washington, D.C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., Washington, D.C., for defendant.

## OPINION

REGINALD W. GIBSON, Judge:

This is a corporate employment tax refund suit by plaintiff, The Incorporated Trustees Of The Gospel Worker Society (the Society), in which jurisdiction is premised on §§ 1346 and 1491, Title 28 U.S.C., and § 7422, Title 26 U.S.C. (1954 Internal Revenue Code).[1] The gravamen of this litigation stems from plaintiff's alleged erroneous failure to withhold and pay over FICA (employment) taxes, in the aggregate amount of $1,869.65, based on the alleged market value of meals and lodging (*i.e.*, wages) provided by plaintiff to certain of its member-employees during the first calendar quarter of 1978. As a result of such failure, plaintiff received an audit report dated July 19, 1982, which asserted said

---

1. All statutory references made hereinafter are to the Internal Revenue Code of 1954, as amended and applicable in 1978.

2. The certificate of incorporation disclosed that its purposes were "receiving and holding property, real and personal, of and for unincorporated religious societies and associations belonging to the Christian Church known as the Gospel Worker Society, and of and for unincorporated beneficial, educational, and missionary societies belonging to and connected with the Gospel

FICA taxes to be due. A formal protest was filed which was rejected by the Service, the deficiency was thereafter paid, and an administrative claim for refund was filed on March 10, 1983. Said claim for refund was denied on May 17, 1983, and suit followed in this court on May 26, 1983.

For the reasons delineated hereinafter, on the issue of liability, the court holds that defendant is entitled to judgment. Trial of the valuation issue was severed by court order on September 30, 1983, for a later proceeding.

## FACTS

The facts found hereinafter emanate from the testimony of Miss Julia P. Stabley, president of the Society, and the multiple stipulations by the parties, the latter of which facts are found accordingly.

The Gospel Worker Society, an unincorporated membership organization devoted to non-sectarian religions and charitable work, was founded in 1895 in New Jersey by the Reverend William Musselman. In 1906 the Gospel Worker Society organized The Incorporated Trustees Of The Gospel Worker Society, a not-for-profit corporation, under the laws of the State of Pennsylvania.[2]

Since 1950, the Society has been located in Cleveland, Ohio. This location is the situs of its printing operation, its bookstore, and the home it maintains for its members. All of the foregoing activities are conducted under a single corporate structure. The home maintained by the Society consists of three floors and a basement, which contain a chapel, a library, a dining room, a kitchen, a laundry, and a nursing area. Each member has her own

---

Worker Society." On October 25, 1960, paragraph 2, of the Articles of Incorporation was amended to read, *inter alia,* as follows: "The purposes for which said corporation is formed are: (1) to propagate the Christian gospel by means of the printing, publication and dissemination of Christian literature and the maintenance of Missions; (2) to receive and hold property real and personal to be utilized in furtherance of the above purposes."

private room. Prior to 1962, the Society maintained missions in various locations such as Cleveland, Youngstown, and Pittsburgh, for purposes of disseminating the Gospel of Christ and the carrying on of missionary and charitable field work. However, in 1962 the last mission associated with the Society was closed.

Membership in the Society, historically, has consisted of women who became members by filing a written assent to devote their lives to the service of the Lord, and to work for the Society and the Union Gospel Press, *infra.* That is to say that in earlier years the *members* received no compensation, payments or wages, other than their care and maintenance.

Specifically, a person seeking membership is required to first make application for such membership by filling out the Applicant's Blank. Thereafter, the applicant is admitted for a probationary period of several months, and upon acceptance for membership, a Candidate Blank must be duly completed and signed. The Society has no written document, by-laws, rules, regulations or contract, setting forth an obligation to furnish its members with food, shelter, and clothing.[3] However, the Society contends that the membership form "manifests" a member's agreement to accept care and maintenance during membership which has consistently been provided to all members in good standing without regard to their physical abilities to perform duties within the Society. Membership has dwindled from approximately 80 in 1930 to 25 in the year in issue. The Society thus undertakes by promise to care for its members during their active and declining years where they have given their services over past years.

The primary function of the Society has been the spreading of the Gospel by use of the printed page. In this connection, the Union Gospel Press, a divisional operation of the Society, publishes religious litera-

ture, including but not limited to a line of Sunday School material, following a set of topics prepared by the National Council of Churches. The Society owns and controls the press operation and its current income emanates primarily from the sale of religious literature.

The Internal Revenue Service determined in 1937 that the Society was a tax exempt organization. This status was reconsidered and reaffirmed in 1953 and again in 1964. Because of the decision in *The Incorporated Trustees Of The Gospel Worker Society v. United States,* 510 F.Supp. 374 (D.D.C. 1981), *aff'd* 672 F.2d 894 (D.C.Cir.1981), *cert. denied,* 456 U.S. 944, 102 S.Ct. 2010, 72 L.Ed.2d 467 (1982), however, its tax exempt status was revoked retroactive to July 1, 1963. In that case, the court found that "the only discernible activity of the Society, apart from the maintenance of the ladies, was the publication of religious literature of the Gospel Press." *Id.* at 375–76. For this reason, and because of the substantial profits accumulated by the Society and the substantial salaries of its non-member officers, the court held that "taken together [these circumstances] present a picture of a publishing enterprise the primary purpose of which is profits, not salvation." *Id.* at 380.

Miss Stabley, the president since 1971 (vice-president 1938–1971), testified that the Society's home and the Press are located on the same grounds, and that the members would not be Gospel Workers if they did not live there. Moreover, she testified that all of the members were expected to attend religious services in the home, which were held daily (for approximately 15 minutes) at 6:20 a.m. and after the evening meal. Two of the ladies at the home did not attend these services or meals, however, except for Sunday dinner.

The members at one time, between 1956 and 1975, were charged for meals and lodging (*i.e.,* apparently only those who worked

---

**3.** Revised By-Laws (as of April 1976), with respect to qualifications for membership provides only that "Any probationer in good standing of the Gospel Worker Society ... may be eligible

for election to membership to this corporation." It further provides that any qualified person may become a member upon election by a two-thirds vote of all the members in good standing.

and were paid wages). Thereafter, a no-charge policy for meals and lodging was instituted and continued through the period in issue, to avoid unrelated trade or business tax issues (in connection with the Society's previous tax exempt status).[4] Meals are provided for breakfast, lunch, and dinner seven days per week (*i.e.,* including non-working days), and breakfast and dinner are served *before* and *after* working hours, respectively.

Some, but not all, of the members are employed by the Society and receive cash wages. If free meals and lodging were not provided, appropriate facilities are nearby sufficient to enable them to find adequate lodging and meals; however, some would, of course, have required higher pay in order to live elsewhere. The parties specifically stipulated that "If they [employee/members] did not receive free meals and lodging, there is no question that they could adequately perform the duties that they perform in the Press operations."

There were eight "employees" (members) of the Society performing services who received free meals and lodging during the first quarter of 1978. It is those perquisites that are in issue here as "wages" for FICA purposes. The testimony of said employees is set forth in joint stipulations by the parties. All such persons acknowledged that free meals and lodging were provided by the Society on its business premises during the first quarter of 1978. Plaintiff also hired a number of non-member employees as nurses, kitchen helpers, maintenance workers, etc., who did not live on the premises, but were provided free meals when served during their working hours.

In its reply brief, plaintiff apparently concedes the initial hypothesis, *infra,* that:

*If* the ladies are to be viewed merely as isolated *factory workers* [*i.e.,* as common law employees], *the brief of the Government is effective.* [Emphasis added]. If, however, proper consideration is to be

given to the communal and religious life the members of the Society have been observing since 1895, the brief for the defendant does not meet the evidence in this case.

In short, the court understands plaintiff to be contending that the eight members of the Society, who performed services as employees and received cash wages, received free meals and lodging *solely and primarily as "members" of the Society,* as do the unemployed members, and not in connection with their functions as "employees." Thus, it is contended that such "perks" were and are received for the reason that "they were members of the Society and they lived in the home because it is their home." It is further averred in the brief for the plaintiff that "[t]he only issue on which evidence has been offered is whether the meals and lodging furnished by plaintiff to its *members* [not to its members in their status as "employees"] are exempt from taxation under § 119(a) of the Internal Revenue Code."

Defendant contends, on the other hand, that since the meals and lodging "furnished by the plaintiff were furnished pursuant to an employment relationship" (albeit hybrid), the value thereof is remuneration for employment (wages).

In its brief, defendant postures the dispositive issue as follows:

Whether the fair market value of the meals and lodging furnished by plaintiff to its *employees* is excludable from *wages* for purposes of employment taxes on the basis of having been furnished for the convenience of the employer within the meaning of Section 119....

## DISCUSSION

The starting point in our analysis begins with section 61, Title 26 U.S.C., which provides, *inter alia,* that "gross income means all income from whatever source derived, including but not limited to compensation

---

**4.** Miss Stabley testified, however, that as a result thereof "no adjustment [was] made at that time with regard to the compensation that ladies received when they ceased to pay for their room and board."

for services." Treas.Reg. § 1.61–2(d)(1) amplifies the foregoing statutory clause by providing that "if services are paid for in property, the fair market value of the property taken in payment must be included in income as compensation." Treas.Reg. § 1.61–2(d)(3) further provides that "[t]he value of living quarters or meals *which an employee receives* in addition to his salary constitutes gross income unless [excludable under] section 119." (Emphasis added.) Thus, if the provisions of I.R.C. § 119, *infra*, are met and such value is excluded from gross income for purposes of § 61, Title 26 U.S.C., then said value is necessarily, and concomitantly, excluded from the definition of "wages" for employment tax purposes against the employer, under §§ 3101, 3111, and 3121(a) (FICA). *See Rowan Cos., Inc. v. United States,* 452 U.S. 247, 255, 101 S.Ct. 2288, 2293, 68 L.Ed.2d 814 (1981).

As the criterion for measuring employer obligations under FICA,[5] FUTA,[5] and income tax withholding,[6] Congress chose "wages" as the base. In *Rowan Cos., Inc. v. United States,* 452 U.S. at 255, 101 S.Ct. at 2293 (1981), the United States Supreme Court stated that "the plain language of the [foregoing] statutes [defining wages] is strong evidence that Congress intended 'wages' to mean the same thing under FICA, FUTA, and income-tax withholding." Thus, it is evident that if under either definition the employee receives "wages," then in such case the employer is subject to employment taxes thereon.

The threshold operative statutes (*i.e.,* §§ 3102 and 3111) in issue here relating to

the question and standard whether plaintiff was required to withhold and pay over employment taxes on the value of the meals and lodgings received by the eight ladies who were employee-members of the Society, provides that:

> *Deduction of Tax From Wages* § 3102: The tax imposed by section 3101 [on employees] shall be collected by the employer of the taxpayer, by deducting the amount of the tax from the wages ...
>
> *Tax on Employers* § 3111: ... There is hereby imposed on every employer an excise tax, with respect to having individuals in his employ, equal to the following percentages of the *wages* [[7] defined § 3121(a)] paid ... with respect to employment ...

In embellishing the definition of "wages" for withholding tax purposes, Treas.Reg. § 31.3401(a)–1(b)(9) further states that:

> The value of any meal and lodging furnished to an *employee* [[8] by his employer is not subject to withholding if the value of the meals and lodging is excludable from the gross income of the employee.

Thus, the foregoing standards establish the following dichotomy:

1. If the *value* of meals and lodging *is excludable* from gross income, under § 119, they would *not* be "wages" for purposes of the dispositive issues here; and

2. Conversely, if said value is not excludable under § 119, then such value would constitute "wages" for employment tax purposes.

---

5. "Wages" are defined (identically in FICA and FUTA) "as all remuneration for employment, including the cash value of all remuneration paid in any medium other than cash" (§ 3121(a), FICA, and § 3306(b), FUTA).

6. "Wages" are defined (for purposes of withholding) as "all remuneration ... for services performed by an employee for his employer, including the cash value of all remuneration paid in any medium other than cash" (§ 3401(a)), Treas.Reg. § 31.3401(a)–1(a).

7. Treas.Reg. § 31.3121(a)–1(b) defines "Wages" as "all remuneration for employment unless

specifically excepted under § 3121(a)." Subsection (c) thereof provides that "[t]he name by which the remuneration for employment is designated is immaterial"; and subsection (e) further provides that "the medium in which the remuneration is paid is also immaterial. *It may be paid ... in* something other than cash, as for example ... *lodging, food ...*" (Emphasis added.)

8. Treas.Reg. § 31.3401(c)–1(a) defines "Employee [as] every individual performing services if the relationship between him and the person for whom he performs such services is the legal relationship of employer and employee."

There is no dispute as to whether the eight ladies received meals and lodging of value in the first quarter of 1978 in addition to their salaries.[9] The parties concede and the court so finds. Given the operative language of the foregoing regulation(s), the dispositive question in the case at bar, therefore, is whether the value of the meals and lodging provided to subject members of the Society, who were also employees of the Society, is excludable from gross income under I.R.C. § 119. This section provides, in pertinent part, as follows:

(a) *Meals and Lodging Furnished to Employee, ... Pursuant to Employment.*—There shall be excluded from gross income of an employee the value of any meals or lodging furnished to him ... by or on behalf of his employer *for the convenience of the employer,* but only if—

(1) in the case of meals, the *meals are furnished on the business premises of the employer,* or

(2) in the case of *lodging, the employee is required to accept such lodging on the business premises of his employer as a condition of his employment.* (Emphasis added.)

■ The operative test under this statute is whether the meals furnished to said employees were (i) furnished for the convenience of the employer and (ii) furnished on the business premises of the employer. In the case of lodging, in addition to criterion "(i)," *supra,* the second prerequisite is that the employees must be required to accept such lodging on the business premises of his employer as a condition of their employment. Our predecessor court has stated,

however, that "There does not appear to be any substantial difference between the ... 'convenience of the employer' test and the 'required as a condition of his employment' test." *United States Junior Chamber of Commerce v. United States,* 167 Ct.Cl. 392, 397, 334 F.2d 660, 663 (1964). The parties agree that the meals and lodging were furnished to subject employees on the "business premises" of plaintiff. Thus, the question in the instant case boils down to the single issue of whether the meals and lodging were provided "as a condition of ... employment" or "for the convenience of the employer," since the predecessor court has held both issues not to be substantially different.

Plaintiff contends that although the application of terms such as "employment," "employer," and "income" to the activities and remuneration of its *members* is "strained," "nothing could be clearer than that both the terms and spirit of § 119(a) apply." Specifically, it avers that because the Society required its members to live on the premises, including those who became employees, its provision of meals and lodging to the eight employee-members involved in this case was for the convenience of the employer.[10] Defendant vigorously disputes this assertion, arguing that the evidence is clear that the furnishing of meals and lodging by plaintiff to the eight employee-members was not necessary to enable them properly to perform their duties.

■ In assessing the validity of these contentions, this court must adhere to the following standards, delineated by our predecessor court in *Bob Jones University*

---

**9.** Evidence adduced by defendant's Exhibit 1 established that each of the eight ladies received a salary in 1978, for services rendered, as reflected on their W–2 forms.

**10.** The court observes that plaintiff has not contended specifically that the meals and lodging furnished to subject member-employees were not "remuneration for employment," and thus entirely outside the scope of §§ 3121(a) and 119. Instead, by relying exclusively on § 119, plaintiff has consistently argued, before both the I.R.S. and this court, that the meals and

lodging provided were "Meals and Lodging Furnished to Employee[s] ... Pursuant to Employment," but which are excludable under this section. Although there is a modicum of evidence on the record indicating that the meals and lodging were provided solely on the basis of membership in the Society, rather than as compensation for services rendered, other creditable evidence indicated that room and board was provided as remuneration in place of additional cash wages to the employees.

*v. United States*, 229 Ct.Cl. 340, 350, 670 F.2d 167, 174 (1982), wherein it stated that:

> Two cannons of tax law are guides in determining whether plaintiff has qualified for the exclusion from gross income under section 119. First, "provisions within tax legislation granting *exemptions* [should] be strictly construed in accordance with their terms." ... Second, "tax assessments made by the Commissioner of Internal Revenue are presumptively correct and must stand until controverted by a preponderance of the evidence produced by the taxpayer." (Emphasis added.) (Citations omitted.)

As will be seen, *infra*, the operative proof adduced by plaintiff is woefully insufficient to meet the substantial burden it bears to satisfy the elements of § 119.

With respect to the lodging issue, Treas. Reg. § 1.119–1(b) sets forth the same three-part test as is contained in the statute, *supra*. Said regulation further provides that:

> The requirement ... that the employee is required to accept such lodging *as a condition of his employment* means that he be required to accept the lodging *in order to enable him properly to perform the duties of his employment*. Lodging will be regarded as furnished to enable the employee properly to perform the duties of his employment when, for example, the lodging is furnished because the employee is required to be available for duty *at all times* or because the employee could not perform the services required of him unless he is furnished such lodging.... (Emphasis added.)

█ In applying the foregoing statute and applicable regulation, the courts have not required that plaintiff show that performance of its employees' duties would be impossible without employer-provided lodging. *Bob Jones University*, 229 Ct.Cl. at 350, 670 F.2d 167. *Caratan v. Commissioner*, 442 F.2d 606, 609 (9th Cir.1971). Plaintiff must demonstrate, however, that the lodging it provides is "integrally related" to the duties of its employees. *Bob Jones University*, 229 Ct.Cl. at 350, 670

F.2d 167; *McDonald v. Commissioner*, 66 T.C. 223, 232 (1976).

█ In determining whether the requisite integral relationship exists, it is important to note that "[T]he standard prescribed by Congress is not subjective. It is objective. The employer's state of mind is *not* controlling." *Dole v. Commissioner*, 43 T.C. 697, 706 (1965); *quoted in Bob Jones University*, 229 Ct.Cl. at 351, 670 F.2d 167. Objective examination of the evidence here compels the conclusion that the lodging furnished to plaintiff's employees was clearly not integrally related to the duties they performed. For example, excerpts from the depositions of the eight subject employees themselves, placed on the record by the parties, are probative of the fact that each of said employees did *not* need to reside on the business premises of plaintiff in order to properly perform their employee duties. Six of the eight ladies perform regular daytime shifts of between four and eight hours per day, in places such as plaintiff's press, the laundry room, the treasurer's office, etc. With respect to the other two, one of them, Miss Stepler, is a nurses' aide, who occasionally works night shifts, but works an eight-hour day and a forty-hour week. Moreover, she always receives 24 hours advance notice before working a night shift and has never been asked to drive someone to the hospital or to drive anywhere at night.

The last of the eight employees, Miss Bossard, serves as the house administrator, and must open the doors early in the morning (5–6:00 a.m.) and set up the cafeteria for breakfast each night at 6:30 p.m. Yet Miss Bossard testified that, aside from these duties, she only works a seven-hour shift, from 7:30 a.m. to 2:30 p.m., and was free to do as she pleased after 7 p.m., and other than fire alarms, emergencies do not arise for her to handle. Perhaps most importantly, four of the eight ladies, including Miss Bossard, testified that their duties *did not* require them to live on the premises, and none of the remaining four ladies testified to the contrary.

In light of the foregoing, this court cannot accept the notion that the furnishing of lodging was integrally related to the duties performed by the *employees*. For the purpose of satisfying the requirements of § 119, such objective evidence vitiates the vitality of the subjective assertions of plaintiff. This is especially true inasmuch as plaintiff has no requirement that its *non-member employees* live on the premises, and in fact hires a number of non-member employees, who live off the premises, in somewhat comparable jobs to those of the eight member-employees.[11]

This court believes that the facts in the *Bob Jones University* case, *supra*, substantially mirror the facts here, particularly with respect to the lodging provided. In that case, plaintiff was a university with a strong religious orientation, which provided much of its faculty and staff with free meals and lodging on campus. It contended therein that the meals and lodging it provided were integrally related to the purpose of the university, inasmuch as its faculty would be able to better serve as role models, "visible to the students as Christian believers, if they lived and ate on campus." 229 Ct.Cl. at 344, 670 F.2d 167. After an objective evaluation of the evidence, however, the court found that plaintiff's employees "were not required to accept plaintiff's lodging to perform their duties properly." *Id.* at 351, 670 F.2d 167. Specifically, the court found that plaintiff's employees could perform their duties, including teaching, attending religious services, and occasional counseling and entertainment of students, whether or not they were provided with lodging on campus. Hence, the court held that:

> ... plaintiff's failure to meet the "convenience of the employer" test is anchored in the tangential role plaintiff's lodging played in the accomplishment of its religious and educational goals.... While religious and educational goals may have been collaterally served to some minor extent ... the indirect nexus of free lodging to plaintiff's educational and religious goals did not require plaintiff to subsidize it.

*Id.* at 354, 670 F.2d 167.

The parties stipulated Miss Stabley's deposition testimony that besides the ladies' specific duties, *supra*, "and emergencies such as answering the telephone and door, [she] cannot think of anything else that the ladies do." Moreover, the evidence shows that Miss Stabley's brother is on the premises most of the year and handles emergencies.

Because the evidence here is essentially uncontroverted that plaintiff's employees would be able to perform their duties even if they lived outside the Society's premises, this court is compelled to follow *Bob Jones* and hold that the lodging furnished to the eight member-employees of plaintiff is not excludable from income under § 119, and are "wages" for employment tax purposes.

The same result must also obtain with respect to the meals provided subject member-employees. The regulation applicable to meals, Treas.Reg. § 1.119–1(a), applies the "convenience of the employer" test by means of the following pertinent language:

> (2) *Meals furnished without a charge.*
> (i) Meals furnished by an employer without charge *to the employee* will be regarded as furnished for the convenience of the employer if such meals are furnished for *a substantial noncompensatory business reason* of the employer. If an employer furnishes meals as a means of providing additional compensation to his employee (and not for a substantial noncompensatory business reason of the employer), the meals so furnished will not be regarded as furnished for the convenience of the employer.... In determining the reason of an employer for furnishing meals, *the mere declaration that meals are furnished for a noncompensatory business reason is*

11. To the extent that the "required as a condition of employment" test must be satisfied in proof of the "convenience of the employer" test, it is highly significant to note that plaintiff has never contended that it was a condition of *employment* (which is the § 119 test), rather than membership, that employees live on the premises.

*not sufficient to prove that meals are furnished for the convenience of the employer,* but such determination will be based upon an examination of all the surrounding facts and circumstances.... *Generally,* meals furnished *before or after working hours* of the employee will *not be regarded* as furnished for the convenience of the employer.... Meals furnished on nonworking days do not qualify for the exclusion under section 119.... (Emphasis added.)

As is the case for lodging, it is apparent from this regulation that eligibility for exclusion of the value of meals from income must also be based upon an *objective* evaluation of the evidence, rather than plaintiff's hospitable subjective perceptions. *See Bob Jones University,* 229 Ct.Cl. at 341–42, 670 F.2d 167. Objective evaluation of the circumstances in the case at bar reveals that plaintiff had no substantial noncompensatory business reason for furnishing meals to its member-employees.

In the first place, the morning and evening meals, served at 6:30 a.m. and 5:00 p.m., were served *before* and *after* the normal working hours of all but one of the member-employees (Miss Bossard). Pursuant to the general rule in the regulation, *supra,* such meals may not be considered to be furnished for the convenience of the employer.[12] Moreover, those meals furnished to member-employees on non-working days clearly do not qualify for exclusion under the regulation.

With respect to meals served during working hours, the foregoing regulation provides examples of situations in which meals are offered for substantial noncompensatory business reasons, the most pertinent of which are (i) where employees must be available for emergencies during meals;

(ii) where employees are restricted to a short meal period, such as 30 to 45 minutes, during which they could not be expected to eat elsewhere; and (iii) where employees cannot otherwise secure proper meals within a reasonable meal period.

Although plaintiff's president, Miss Stabley, testified that members of the Society must respond to emergencies, such as taking fellow members to the hospital or responding to a fire alarm, all of the eight member-employees testified either that they were never on call for emergencies during meals or that they had never been called out of a meal for an emergency. No indication whatsoever exists on the record that any of the eight ladies were subject to restricted eating hours—to the contrary, one of the ladies testified that there was no time limit on meals, and others testified that they could spend one hour for meals. Moreover, the parties stipulated that there are adequate restaurant facilities near plaintiff's home at which to eat, and all of the eight ladies stated that they could go out for meals if they desired. Indeed, two of the eight ladies, Miss Bachman and Miss Todd, testified that they only eat meals with the other ladies on Sundays. More significantly, Miss Wolf testified that "[m]eals were provided to promote the morale or good will of the ladies." Treas.Reg. § 1.119–1(a)(2)(iii) provides such meals will be deemed to be furnished for a compensating business reason of the employer, and therefore not furnished for the convenience of the employer.

In view of all of the foregoing, it is clear beyond cavil that plaintiff has not sustained its burden to show that a substantial noncompensatory business reason existed for providing meals for its eight member-employees.

---

12. The exceptions to this general rule, set forth in Treas.Reg. § 1.119–1(a)(2)(ii) and applicable to food service employees and those employees unable to obtain a meal during working hours, are clearly inapposite to the instant case.

## CONCLUSION

Prior to the trial on the merits, this court granted plaintiff's motion to sever the trial of the valuation and liability issues. Premised on the above, judgment shall be entered in favor of defendant and against plaintiff on the issue of liability.

With respect to the valuation issue, the parties shall file a stipulation on or before September 28, 1984, as to the value of the meals and lodging and the applicable tax. Failing such, a trial on the valuation issue shall commence in this court in Washington, D.C. at 10:00 a.m. on Tuesday, October 2, 1984, on said issue.

If a stipulation is filed as to the value of the meals and lodging for the first quarter of 1978 respecting the eight (8) employees, it shall also contain a calculation of the applicable FICA taxes due thereon. The Clerk shall then issue judgment in said amount in favor of defendant.

IT IS SO ORDERED.